AF 14900640 1 2-664

Travis Edward Martin
In Pro Per
1746-F South Victoria Avenue, Suite 104
Ventura, California 93003
Email: martin57290@gmail.com

FILED
SEP 23 2026
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY PDL DEPUTY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

TRAVIS EDWARD MARTIN, an individual,

Plaintiff,

v.

ALLEN REYNOLDS BALL, an individual; BALL & YORKE, a California law firm, form unknown; RON BAMIEH, an individual; BAMIEH & DE SMETH, PLC, a California professional law corporation; JAMES WALD, an individual; NATALIE WALD, an individual; JAYSON COHEN, an individual; MEAGAN YATES, an individual; RAFAEL ORELLANA, an individual; COUNTY OF VENTURA, a public entity; JEFFREY MACOMBER, individually and in his official capacity as Secretary of the California Department of Corrections and Rehabilitation; RAFAEL ACEVEDO, individually and in his official capacity; and DOES 1 through 50, inclusive,

Defendants.

**Case No. 3:26-cv-04899-BAS-DEB**

Judge: Hon. Cynthia Bashant
Magistrate Judge: Hon. Daniel E. Butcher

[Removed from the Superior Court of California, County of San Diego, Case No. 26CU038533C]

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF**

1. First Amendment Retaliation (42 U.S.C. § 1983)
2. Procedural Due Process (42 U.S.C. § 1983)
3. Unlawful Restriction of Correspondence; Prior Restraint (42 U.S.C. § 1983)
4. Denial of Access to the Courts (42 U.S.C. § 1983)
5. Deliberate Fabrication of Evidence (42 U.S.C. § 1983)
6. Conspiracy to Violate Civil Rights (42 U.S.C. § 1983)
7. Municipal Liability (Monell)
8. Declaratory and Injunctive Relief (28 U.S.C. §§ 2201-2202; Ex parte Young)
9. Tom Bane Civil Rights Act (Civ. Code § 52.1)
10. Tom Bane Civil Rights Act (Civ. Code § 52.1)
11. Tom Bane Civil Rights Act (Civ. Code § 52.1)
12. Libel
13. Intentional Infliction of Emotional Distress
14. Civil Stalking (Civ. Code § 1708.7)
15. Abuse of Process

**DEMAND FOR JURY TRIAL**

AF 14900640 1 3-664

This First Amended Complaint is filed as of right under Federal Rule of Civil Procedure 15(a)(1)(B). The Defendants answered rather than move under Rule 12 so that Plaintiff could amend, and their counsel confirmed in writing that they would 'await service of the amended complaint within 21 days.' (Ex. Y.) This pleading is that amendment, filed within the 21 days

Plaintiff TRAVIS EDWARD MARTIN, in pro per, alleges as follows. Allegations made on personal knowledge are so identified by the verification at the end of this pleading; all other allegations are made on information and belief after review of the documents cited.

## I. INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1983 and California law against two law firms, their clients, a sheriff's sergeant, a deputy district attorney, the County of Ventura, and the two officials who run California's prison system. It arises from a scheme that has now run for more than three years: to silence an incarcerated litigant's dissemination of a public criminal trial record by reporting him to the police as a criminal, procuring his solitary confinement and a disciplinary conviction on a charge the prison's own hearing officer certified was never proved, and then using the resulting "no contact" gag to strip him of the ability to defend the lawsuit the Walds brought against him and to prosecute the lawsuit he and his companies brought against the Walds. The state actors supplied the custody, the interrogation, the solitary cell, the conviction, and the gag. The private actors supplied the lies. Every one of them now says the same thing to every court that will listen: that the prisoner is a "convicted child molester" and that the courts should therefore stop reading.

2. The label is the whole strategy, and the man who best exposes it is a Defendant. Deputy District Attorney Rafael Orellana, who prosecuted Plaintiff and now sits on the other side of this caption, told the jury in his closing argument exactly who the parents in this case are: "Payton's selfish parents ignored her cry for help. They put their own needs ahead of hers. She told them. When she was four or five years old, she

AF 14900640 1 4-664

told them what was going on. And instead of doing what they should have done and doing what Natalie had been trained to do and reporting it, they put their own wants and desires first. Their friendship with the defendant, they put that ahead of their daughter. The things they enjoyed doing with the defendant, the babysitting, the trips they couldn't afford, the fun side job running the sound company, they put all those things ahead of their own child, and they let the defendant continue to molest Payton for years more." (RT 1727.) That is the State's own account of James and Natalie Wald: parents who were told, who believed, and who kept handing over their daughter for the money, the trips, and the company. Plaintiff's offense, in Defendants' eyes, is that he put the transcript containing those words in front of the public. Every report to the police, every letter to a warden, every motion to declare him vexatious, and every ruling that adopted them exists to make sure no one reads that transcript, and every one of them opens with the words "convicted child molester" so that no one has to. A conviction does not repeal the First Amendment, the Petition Clause, the Due Process Clause, or the statutes that guarantee an incarcerated litigant the right to prosecute and defend his civil cases. The Private Defendants know that. They rely on courts not caring and frankly it's worked for them so far.

3. The record does not permit that shortcut. The prison's Senior Hearing Officer, Lieutenant P. Jones, wrote the sentence that decides this case: "Although the Subject request proof that he was contacting his victim and family was not submitted into evidence, was not an element considered when establishing if the evidence against the Subject outweighs the Subject's argument." (Ex. L.) The charge was "threatening emails to the Office of Attorney Bamieh & De Smeth and the victim's family." (Ex. F.) There was no email to Bamieh & De Smeth. There was no email to any victim or family member. There were two emails to opposing counsel, Allen Ball, about Allen Ball's conduct in a lawsuit Allen Ball was defending, sent by Plaintiff's mother from a Gmail account outside CDCR's system after CDCR itself reviewed and approved the underlying tablet message. Ball captioned those two emails to himself as "Electronic

AF 14900640 1 5-664

Harassment of Victim's Family by Inmate," enclosed them, and mailed the package to a prison warden with a request for "discipline or prosecution." (Ex. E.) The enclosures disproved the caption. He sent it anyway.

4. What followed was not an investigation. It was execution of a request. The prison's Litigation Office referred the letter to the Investigative Services Unit at 5:27 p.m. on August 4, 2025, adopting Ball's accusation as its own "notification." Thirty-five minutes later Natalie Wald forwarded a two-year-old email chain with Sheriff's Sergeant Meagan Yates, the record of an open criminal investigation, to Ball's office, which printed it the next morning while the charge was being written. At 9:52 a.m. on August 5, Sergeant D. Eustaquio read Plaintiff his *Miranda* rights, told him that if he did not stop communicating with civilians ISU would "immediately seek action with the San Diego District Court and file charges for harassment under Penal Code 646.9," and by 1:00 p.m. "concluded" his investigation. Lieutenant D. Servantes then locked Plaintiff in the Restricted Housing Unit on the strength of "confidential information" from "CS #1": an attorney's demand letter recast as an anonymous informant. (Exs. F, G.) Plaintiff spent the next three days in an intake cell with no running water and no regular meals, and the next thirty days in solitary confinement, while his lawyer's written pleas to the Warden and the Litigation Coordinator went unanswered. (Ex. H.) When the hearing came, Sergeant Eustaquio testified that "[m]y determination for the RVR was made on August 5, 2025 when I received notification from The Law Office of Ball and Yorke." That is the entire case against Plaintiff, in the charging officer's own words.

5. The gag that came out of that hearing is the reason this case is in federal court. Lieutenant Jones did not merely convict on a charge he certified was unproved; he ordered Plaintiff to cease all contact with two law firms and their clients and to "communicate through the court personnel," citing California Rules of Court, rule 2.251(b), an electronic-service consent rule, as his authority. (Ex. L.) Those two law firms are opposing counsel in the two Ventura actions between Plaintiff and the Walds: the Bamieh Firm sues Plaintiff on the Walds' behalf, and the Ball Firm defends the

AF 14900640 1 6-664

Walds and Cohen in the action Plaintiff and his companies brought against them. Both firms have since written to the Warden conceding, in their own words, that the order "prevents inmate Martin, who is currently self-represented in this litigation, from engaging in any necessary attorney-party communications with our office concerning the lawsuit," and that Plaintiff "cannot prosecute a lawsuit that he has filed against our clients" without violating it. (Exs. N, O.) A Ventura judge directed those letters. CDCR has not answered them, or the judge, in nine months. Defendants Macomber and Acevedo, the officials with statutory responsibility for Plaintiff's custody, received written notice of every step of this, beginning August 6, 2025, and did nothing.

6. Then the arsonists reported the fire. Sixteen days after Plaintiff filed this action, the Bamieh Firm moved in Ventura to have him declared a vexatious litigant. Sixteen days after that, the Ball Firm filed the same motion in the second Ventura case, mailing it to the prison in defiance of a June 15, 2026 court order directing service at Plaintiff's Ventura address, and then filed a third copy in this Court (Dkt. 5) eight days after removal. Each motion is built on the gag its authors procured: the missed appearances CDCR caused, the discovery Plaintiff was forbidden to serve, the "sanctions" that were never imposed, and the "harassment" that CDCR's own hearing officer certified was never proved. The Bamieh Firm's reply brief supplied the admission that unmasks all three: "His abuse of the civil judicial process is a prolonged and twisted means of continuing to harm his victim and her family." (Ex. T.) The "harm" is the litigation. The "harassment" is that Plaintiff sued them and answered when they sued him. That is what these Defendants reported to the police, and that is what they asked a prison to punish.

7. The state courts have not cured any of this. On March 20, 2026, the court in the 2024 Ventura action found that CDCR "held a fair hearing" and that Plaintiff "elected not to attend," when the hearing results attached to Plaintiff's own declaration record, on their face, that Plaintiff was "Present," pleaded "Not Guilty," "made a statement," and cross-examined the reporting employee by speakerphone. (Exs. L, P.)

AF 14900640 1 7-664

On December 16, 2025, the court in the 2023 Ventura action found that the no-contact order "resulted from Martin's actions," on a record showing that it resulted from Ball's and Bamieh's letters. On September 4, 2026, another judge ordered Plaintiff to copy the Bamieh Firm on every email to her courtroom, the act CDCR has told him he will be "held accountable" for. (Ex. P.) None of those judges is a defendant, and no relief is sought against any court. Their rulings are pleaded for what they are: the injury Defendants' false narrative was designed to produce, proof that the narrative worked, and proof that no state forum will cure it because defendants call him a convicted child molester, so the courts don't have to bother with applying the law.

## II. JURISDICTION AND VENUE

8. This Court has original jurisdiction over the claims arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and supplemental jurisdiction over the California claims under 28 U.S.C. § 1367(a), because they arise from the same reports, the same disciplinary proceeding, the same gag, and the same conspiracy as the federal claims and form part of the same case or controversy. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

9. This action was filed in the Superior Court of California, County of San Diego, on July 20, 2026, as Case No. 26CU038533C. Defendants Yates and Orellana removed it to this Court on August 27, 2026 (Dkt. 1; amended Dkt. 2), invoking 28 U.S.C. §§ 1441 and 1443. Plaintiff does not concede that the removal was procedurally proper and has preserved that objection; this amended pleading is filed under Federal Rule of Civil Procedure 15(a)(1)(B) within 21 days after service of the County Defendants' September 3, 2026 answer (Dkt. 3), whose counsel confirmed in writing the same day that he "will await service of the amended complaint within 21 days" under that rule (Ex. Y).

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred at Richard J. Donovan

AF 14900640 1 8 664

Correctional Facility ("RJD") in San Diego County: the referral, the interrogation, the threat of prosecution, the solitary confinement, the three days without water, the disciplinary hearing, the gag, and its continuing enforcement. Each Defendant outside this District purposefully directed reports, demands, evidence, and mailings into this District for the purpose of procuring custodial action against Plaintiff here, and the injury occurred here.

11. Plaintiff has exhausted the administrative remedies CDCR makes available for the disciplinary proceeding and the no-contact directives, as alleged in Section VI, and the physical injury requirement of 42 U.S.C. § 1997e(e) is satisfied by the injuries alleged in paragraphs 64 through 66. The prospective relief requested is narrowly drawn, extends no further than necessary to correct the violation of Plaintiff's federal rights, and is the least intrusive means necessary to correct it. (18 U.S.C. § 3626(a)(1)(A).)

## III. PARTIES

### A. Plaintiff.

12. Plaintiff TRAVIS EDWARD MARTIN ("Plaintiff") is an individual and an incarcerated person in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), CDCR No. BU6031, housed at RJD in San Diego County at all times relevant to this action. He is self-represented and indigent. He is serving an indeterminate term of life with the possibility of parole. Under the Elderly Parole Program, Penal Code section 3055, Plaintiff will become eligible for a parole suitability hearing in approximately fifteen years, when he is 50 years of age or older and has served twenty years of continuous incarceration on his current sentence; section 3055 fixes that eligibility by age and by years of continuous incarceration, so no conduct credit advances or delays it. His release, when eligibility arrives, will turn on a discretionary suitability determination by the Board of Parole Hearings (Pen. Code, §§ 3041, 3055, subds. (c), (e)), not on any computation of credits.

AF 14900640 19-664

**B. The CDCR Defendants.**

13. Defendant JEFFREY MACOMBER ("Macomber") is the Secretary of CDCR. He is sued in his individual capacity for damages and in his official capacity for declaratory and prospective injunctive relief. As Secretary he is vested by statute with "the supervision, management and control of the state prisons, and the responsibility for the care, custody, treatment, training, discipline and employment of persons confined therein." (Pen. Code, § 5054.) He received actual written notice of the retaliatory confinement, the baseless "criminal threats" accusation, the deprivation of water and privileges, and a demand for correction and preservation by counsel's August 18, 2025 letter, transmitted by Federal Express and by email to his office (Ex. I), and he took no action. He has had the authority at every moment since to rescind or modify the no-contact directives and to expunge the disciplinary finding, and he has not done so.

14. Defendant RAFAEL ACEVEDO ("Acevedo") was at all relevant times the Warden or Acting Warden of RJD, "the chief executive officer of that institution," "responsible for the custody, treatment, training and discipline of all incarcerated persons under his charge." (Cal. Code Regs., tit. 15, § 3380, subd. (a).) On or about July 20, 2026 he was appointed Associate Director (Acting), Region IV, Division of Adult Institutions, the region that includes RJD, and in that office he continues to exercise supervisory authority over RJD and its Warden. He is sued in his individual capacity for damages and in his official capacity for declaratory and prospective injunctive relief. Acevedo received direct written notice of Plaintiff's confinement, of the absence of water, and of the retaliatory purpose of the charge by counsel's emails of August 6, 7, 8, and 12, 2025, each addressed to him at his CDCR email address (Ex. H); by counsel's August 18, 2025 letter (Ex. I); by the Bamieh Firm's December 26, 2025 letter addressed to him by name (Ex. N); by the Ball Firm's January 13, 2026 letter to the Warden (Ex. O); and by the Ventura County Superior Court's March 20, 2026 order, which its clerk served on "Warden Rafael Acevedo" by name (Ex. P). He answered none of them. He did not remove Plaintiff from the RHU, did not restore his water, did not correct the

AF 14900640 1 10-664

charge, did not respond to two law firms and a judge, and did not modify the gag. Any relief ordered against Acevedo and Macomber in their official capacities binds their officers, agents, and employees, including the current Warden of RJD, under Federal Rule of Civil Procedure 65(d)(2), and any successor in office is substituted automatically under Rule 25(d).

15. The following CDCR employees are identified by name and role because their conduct is the state action that the Private Defendants and the County Defendants procured and exploited, and because Acevedo and Macomber are liable for knowingly acquiescing in it. They are not named as defendants in this pleading, and Plaintiff expressly reserves all claims against each of them: Correctional Sergeant D. EUSTAQUIO, ISU, who authored RVR Log No. 7636056 and issued the verbal no-contact directive and the threat of prosecution; Correctional Lieutenant B. LOUIE, who approved the RVR four minutes after it was submitted; Correctional Captain ANDRE LEWIS, who classified the RVR on August 11, 2025 while Plaintiff's verified petition naming Lewis as a retaliator was pending in the San Diego Superior Court; Correctional Lieutenant D. SERVANTES, who ordered the RHU placement on the "CS #1" pretext; Correctional Officer D. SANTIAGO III, the investigative employee; Correctional Lieutenant P. JONES, the Senior Hearing Officer; Correctional Captain B. FRANCKOWIAK, the Chief Disciplinary Officer; Lieutenant REESE, who conducted the grievance interview; S. STEADMAN, the Office of Grievances reviewing authority; and FREDDY GOMEZ and ELIZABETH TABOADA, the RJD Litigation Coordinators who transmitted the Ball Firm's accusation to ISU and who received, and did not answer, counsel's and the Ventura court's communications. DOES 1 through 10 are the CDCR employees, presently unidentified or identified above, who participated in, directed, approved, or ratified the conduct alleged; Plaintiff will amend to name them when their roles are confirmed in discovery.

AF 14900640 1 11-664

**C. The Private Defendants.**

16. Defendant ALLEN REYNOLDS BALL ("Ball") is an attorney licensed in California and a principal of the Law Office of Ball & Yorke in Ventura. He authored the July 23, 2025 report to RJD's Warden that set the 2025 chain of events in motion, corresponded directly with the ISU sergeant running the resulting criminal investigation, wrote the Warden again on January 13, 2026 to shape the gag, told a Ventura judge in open court on February 17, 2026 that "the District Attorney has gone after this a couple of times," admitted in writing on May 18, 2026 that he routes litigation mail through the prison so that "the CDCR maintains a written record" that "will bear on any future parole consideration," and has filed two motions to have Plaintiff declared a vexatious litigant on the strength of the gag he procured. He is sued in his individual capacity.

17. Defendant BALL & YORKE (the "Ball Firm") is a California law firm, form unknown, with its principal place of business in Ventura, California. It is liable for the acts of Ball and of its staff, including paralegal Natalie Ball, Cathy Hernandez, and Lauren White, committed within the course and scope of their agency and employment, and for its own participation and ratification. The Ball Firm represents James Wald, Natalie Wald, and Jayson Cohen in *Martin v. Wald*, Ventura County Superior Court Case No. 2024CUNP032821, and represented Ball and the Walds in *Martin v. Colby*, Ventura County Superior Court Case No. 2025CUDF048144, and in the appeal from that case, Court of Appeal Case No. B353855.

18. Defendant RON BAMIEH ("Bamieh") is an attorney licensed in California and a principal of Bamieh & De Smeth, PLC. He wrote the May 26, 2023 letter to the Warden of Pleasant Valley State Prison that supplied the template, the caption, and the demand for "discipline if not prosecution" that Ball reused in 2025; that letter became Attachment #1 to the 2025 charge. His firm's December 26, 2025 letter to Acevedo conceded that the gag prevents Plaintiff from litigating, and his firm's August 5, 2026 motion and September 10, 2026 reply in Ventura seek to have Plaintiff declared a

AF 14900640 1 12-664

vexatious litigant for the litigation the gag prevents him from conducting. He is sued in his individual capacity.

19. Defendant BAMIEH & DE SMETH, PLC (the "Bamieh Firm") is a California professional law corporation with its principal place of business in Ventura, California, liable for the acts of Bamieh and of its attorneys and staff, including Charlotte E. Krem, Danielle De Smeth, and Leala Sparks, committed within the course and scope of their agency and employment, and for its own participation and ratification. The Bamieh Firm represents James Wald, Natalie Wald, P.W., and Elite Sound Company, LLC in *Wald v. Martin*, Ventura County Superior Court Case No. 2023CUPP012195.

20. Defendants JAMES WALD and NATALIE WALD (the "Wald Defendants") are individuals residing in Ventura County. They are the parents of the complaining witness in *People v. Martin*, Ventura County Superior Court Case No. 2021029627, the plaintiffs in the 2023 Ventura action, defendants in the 2024 Ventura action, and clients of both law firms. They supplied, directed, authorized, and ratified the false reports made on their behalf; Natalie Wald personally forwarded the Yates investigative email chain to the Ball Firm on August 4, 2025, thirty-five minutes after the Litigation Office referral that opened the charge; and both have moved, through both firms, to have Plaintiff declared a vexatious litigant.

21. Defendant JAYSON COHEN ("Cohen") is an individual, James Wald's business partner in Elite Sound Company, LLC, a client of the Ball Firm on whose behalf the July 23, 2025 report was expressly submitted ("This office represents Natalie Wald, James Wald and Jason Cohen") (Ex. E), a defendant in the 2024 Ventura action, and a moving party on the Ball Firm's vexatious-litigant motions. He is sued in his individual capacity. Ball, the Ball Firm, Bamieh, the Bamieh Firm, the Wald Defendants, and Cohen are collectively the "Private Defendants."

AF 14900640 1 13-664

**D. The County Defendants.**

22. Defendant MEAGAN YATES ("Yates") is, as the County Defendants admit, "a sworn Ventura County Sheriff's Sergeant" (Dkt. 3, ¶ 5), formerly a detective in the Major Crimes Unit of the Ventura County Sheriff's Office ("VCSO"), the assigned investigating detective in *People v. Martin*, and by her own sworn description an investigator of approximately 25 years' experience who refers to Plaintiff as "the subject of my investigation." She is a peace officer described in Penal Code section 830.1. She is sued in her individual capacity and acted under color of state law at all relevant times.

23. Defendant RAFAEL ORELLANA ("Orellana") is, as the County Defendants admit, "a County of Ventura Deputy District Attorney" (Dkt. 3, ¶ 6), and was the trial prosecutor in *People v. Martin*. He is sued in his individual capacity for conduct after the verdict that was neither the initiation nor the prosecution of any proceeding and that no court process involved, as alleged in Sections IV.A, IV.B, and IV.R. He acted under color of state law at all relevant times. Yates and Orellana are collectively the "County Defendants."

24. Defendant COUNTY OF VENTURA (the "County") is a public entity and political subdivision of the State of California; the County Defendants admit that VCSO "is a department of the County of Ventura." (Dkt. 3, ¶ 7.) The County is sued for municipal liability under 42 U.S.C. § 1983 on the theories alleged in Claim Seven, and, under Government Code section 815.2, for the acts of Yates and Orellana within the scope of their employment on the Bane Act claim alleged in Claim Ten.

25. DOES 11 through 50 are persons and entities whose identities and roles are presently unknown to Plaintiff, including VCSO and District Attorney personnel who transmitted investigative materials to the Private Defendants, and Ball Firm and Bamieh Firm personnel who assembled and transmitted the false reports. Plaintiff will amend this pleading to allege their true names and capacities when ascertained.

26. At all relevant times each Defendant was the agent, co-conspirator, joint actor, and aider and abettor of each other Defendant as alleged in Section V, acted within

AF 14900640 1 14-664

the course and scope of that relationship, and ratified the conduct of the others. No conspiracy between any attorney and that attorney's own client is pleaded anywhere in this complaint.

## IV. FACTUAL ALLEGATIONS

### A. The speech Defendants combined to suppress is a certified public trial record in which the prosecutor told the jury that the Wald Defendants permitted their daughter's abuse for money.

27. The conduct branded "harassment" in every report at issue was the third-party dissemination of the reporter's transcripts of *People v. Martin*, Ventura County Superior Court Case No. 2021029627, and accurate statements about their contents. Those transcripts are certified public records of a public criminal trial. They contain the sworn testimony of Natalie Wald and James Wald and the closing arguments Deputy District Attorney Orellana delivered on September 29, 2022; the jury returned its verdict on October 3, 2022, and Judge David Worley imposed sentence on November 8, 2022. What the record says about the Wald Defendants explains why every Defendant wanted it buried, and it is pleaded first because it is the predicate on which the entire campaign was built.

28. Orellana told the jury, in open court and on the record, that James and Natalie Wald knowingly allowed the sexual abuse of their daughter to continue in exchange for money and benefits. He described them as "Payton's own weak, selfish parents" and continued:

> "And part of the tragedy of this case is the selfish adults who put themselves ahead of the child that they should have been taking care of, that they should have been protecting. Payton's selfish parents ignored her cry for help. They put their own needs ahead of hers. She told them. When she was four or five years old, she told them what was going on. And instead of doing what they should have done and doing what Natalie had

AF 14900640 1 15-664

been trained to do and reporting it, they put their own wants and desires first. Their friendship with the defendant, they put that ahead of their daughter. The things they enjoyed doing with the defendant, the babysitting, the trips they couldn't afford, the fun side job running the sound company, they put all those things ahead of their own child, and they let the defendant continue to molest Payton for years more." (RT 1727.)

29. Orellana then told the jury what the Walds received: "Payton's parents, in a lot of ways they were the perfect targets for this. They were weak. He was able to manipulate and to trap them with his money, with his expertise with the sound company, with his ability to give them the things they couldn't have for themselves that they wanted, the private school they wanted to send their kids to." (RT 1728.) In rebuttal he told the jury it did not need to decide "why her parents failed her so bad" because its task was to judge the defendant, not the parents. (RT 1804.) He never retracted a word.

30. Natalie Wald's sworn testimony supplied the admissions. She testified that she had been a trained mandated reporter continuously since 2008, trained that "you're supposed to report when a child has told you that they are being violated" and to "call CPS and let them do the investigating." (RT 786-787.) She admitted she questioned her daughter about the "licking" of her vagina by Plaintiff roughly twice a month, every other week, for approximately two years (RT 967); that some of the times the child answered "no" she believed the true answer was yes, and that she still did not cut off Plaintiff's access (RT 965); that she confronted Plaintiff about it at least seven times over the preceding couple of years (RT 1057-1058); and that when asked whether she cut off contact after the disclosures she answered "No" (RT 968-969). Asked whether she told Plaintiff "nobody's going to make a canoe out of me," she answered "Yes," and explained: "nobody's going to make a fool out of me, nobody's going to make me go down because they're going down." (RT 1028-1029.) Confronted with her recorded

AF 14900640 1 16:664

October 31, 2021 statement, "I'll get you, sucker. One phone call is all it will take. My pride is bigger than yours. Who do you think they'll believe?", she answered that she "very well could have" said it. (RT 1028.) Orellana repeated the admission in rebuttal: "Natalie Wald telling him, 'You're not going to sink my canoe,' which she said means you're not taking me down with you." (RT 1807.)

31. The July 30, 2020 sequence is the pattern in miniature, proved out of Natalie Wald's own mouth against documentary exhibits: a 71-minute call from her telephone to Plaintiff's at 10:07 p.m. on July 30, 2020, in which she confronted him about another allegation that he was sexually abusing P.W. (RT 1038); a photograph of the children's toys packed up the next day (RT 1038-1039); a photograph dated August 1, 2020, two days after that call and one day after the toys were packed, showing Plaintiff with P.W. and her brother on an outing at which she testified she was also present (RT 1040-1041); and her admission that the family then spent the multi-day Anaheim trip in the same rental house with him (RT 1041). Her verified interrogatory response in the Wald civil action admits the first disclosure, made when P.W. was approximately four, was itself made in the context of a vacation with Plaintiff. Twice, on this record, the child told her mother she was being sexually abused, and twice the response was a vacation with the man she named.

32. James Wald's admissions match his wife's. In verified responses to requests for admission in the 2024 Ventura action he admits that Natalie Wald came to him "very upset" and reported that P.W. said Plaintiff was "licking" her; that he understood that report to mean the oral copulation of his four-year-old daughter; that he spoke to no police officer, no Child Protective Services worker, no pastor, no one; that he knew Plaintiff had served a state prison term for sexual conduct involving a person 13 or younger; and that P.W. later spent time alone with Plaintiff anyway. At trial he admitted he observed conduct between Plaintiff and P.W. that concerned him six or seven times over a couple of years and that his response was to tell the child to get off Plaintiff's lap and return to the television (RT 1172-1173), and, asked whether he did a good job taking

AF 14900640 1 17-664

care of P.W., answered "No": "I failed her." (RT 1219.) The Walds' verified discovery responses admit what they took while it happened: private school tuition, internet service, cell phone service, automobile insurance, Great Wolf Lodge, Disneyland annual passes, SeaWorld, Zoo Safari, Disney on Ice, trips to June Lake, and the sound company itself. James Wald testified that he brought no money to the table when Entertainment Technology was purchased in 2016, that Plaintiff took the acquisition loan in his own name, that ownership was split 90-10 with Plaintiff holding 90 percent (RT 1084-1085), that the company's equipment was worth more than one million dollars (RT 1165-1166), and that by trial, having never bought the business, he was "running 100 percent operations" (RT 1085-1086, 1160-1161, 1163-1164, 1192-1193). On November 26, 2022, roughly two months after the verdict, James Wald, Cohen, and Elite Sound Company coerced Plaintiff's mother, who could not communicate with him, into selling Entertainment Technology's assets for $215,000, against a value of $1,438,000.

33. Plaintiff does not assert these facts as his own accusation. He alleges only what Natalie Wald and James Wald admitted under oath, twice, and what the People's prosecutor confirmed to the jury. On those admissions the "deceived parents" narrative that Ball supplied to CDCR's charging officer on September 5, 2025, that the Walds "initially believed the pedophiles' denials" (Ex. J), is false, and every Defendant knew it was false, because the State's own record had refuted it three years earlier. This is the record every Defendant has worked to bury: the Wald Defendants to protect their reputations, their civil claims, and the company built with Plaintiff's capital; the attorney Defendants to protect their clients' claims and their own names; and Orellana to keep from public circulation his own summation and his own office's decision never to charge the parents he described as facilitating their daughter's molestation for years in exchange for financial benefits.

34. Orellana's exposure in this action is pleaded with precision. Nothing alleged against him arises from the institution or prosecution of *People v. Martin* or of any other proceeding, from any court appearance, or from any act an officer of the court performs.

AF 14900640 1 18-654

The prosecution ended with the October 3, 2022 verdict. Orellana is sued for what came after: a post-conviction campaign, coordinated with Yates and with the Wald Defendants and their lawyers, to suppress and punish the lawful public dissemination of the certified transcripts, including his own closing argument, and to conceal the investigative disclosures made to private litigants. That is the function of a complaining witness and an investigator, not an advocate.

**B. In 2023 the Bamieh Firm wrote the playbook, and Yates and Orellana fed an open criminal investigation to the Walds and their lawyers.**

35. On May 26, 2023, Bamieh, on Bamieh Firm letterhead, wrote to the Warden of Pleasant Valley State Prison under the caption "Electronic Harassment of Victim's Family by Inmate." (Ex. A.) The letter reported that "[t]he Wald's friends, employers, business associates, and even local churches have received numerous social media postings and emails defaming the Walds," asserted that "Ventura County Sheriff Detective Megan Yates recently spoke with someone at your facility" and that "an iPad/tablet issued to inmate Martin contained evidence he was, indeed, the mastermind behind the emails and social media postings," demanded "an internal investigation into Mr. Martin's use of electronics in your facility to terrorize his victim's family," announced Bamieh's "strong belief that any concerted investigation of Martin will expose his current crimes," presumed that "Mr. Martin will be disciplined if not prosecution," and asked for "an update on the success, or lack thereof, of any investigation." The letter enclosed nothing. By its own terms every claimed communication went to third parties: friends, employers, business associates, churches. It identified no communication to any victim or family member, because there was none. A private civil litigator tasked a state prison with investigating, disciplining, and prosecuting the opposing party in his clients' lawsuit, filed the same day, and asked for progress reports.

36. The letter described a prison operation Yates had set in motion. In or about May 2023, Yates communicated with Pleasant Valley State Prison concerning her

AF 14900640 1 19.664

suspicion that Plaintiff was the source of statements circulating under the name "Francis Gallagher" and was using outside associates to transmit them; the Walds' own August 2, 2023 complaint pleads that communication as fact. Yates represented to prison staff that Plaintiff was contacting victims or persons protected by a criminal protective order. Nothing in her possession showed any such contact; her materials showed distribution of public court records to third parties. Prison staff seized Plaintiff's tablet, searched his cell, and on May 17, 2023 compelled his signature on a CDCR Form 128-B "cease and desist" concerning the Walds while admitting there was no evidence of any communication from Plaintiff to any protected person. Two years later CDCR built the 2025 conviction on the artifacts of that operation: the hearing officer relied on the May 17, 2023 Pleasant Valley 128-B, labeled Attachment #2, and on the Bamieh letter carrying Yates's investigative findings, labeled Attachment #1, as proof of a "pattern of conduct." (Ex. L.) Yates's false predicate in 2023 became the load-bearing evidence for Plaintiff's punishment in San Diego in 2025.

37. Yates then carried the campaign to a private citizen's front door. In June 2023, Yates personally went to the Port Hueneme home of MaryLove Williams, told Williams that she was engaging in criminal conduct by helping Plaintiff circumvent a criminal protective order, and threatened criminal action if Williams continued assisting with the dissemination of the trial transcripts. That statement was knowingly false: nothing before Yates showed any communication from Plaintiff or Williams to any protected person, only distribution of public court records to third parties. The threat worked; Williams stopped. On June 30, 2023, the Bamieh Firm sent Williams a cease-and-desist letter on the Walds' behalf pressing the same "helper" theory and asserting that evidence found in Plaintiff's possession in prison proved coordination between Williams and others. That prison-side investigative information reached the Bamieh Firm from Yates, directly or through the Wald Defendants, while the investigation was open. Williams first reported Yates's visit to Plaintiff on September 5, 2025; Plaintiff neither knew nor had reason to know of it before that date.

AF 14900640 1 20-664

38. The August 2, 2023 email chain, which Plaintiff first obtained on September 5, 2025 through civil discovery and which the Ball Firm printed on the morning the 2025 charge was written, records the coordination in the participants' own words. (Ex. B.) At 9:19 a.m. on August 2, 2023, an email from "PPG" captioned "VENTURA, ARE WE OK WITH THIS?" went to a "Concerned parents Group" that included a pastor's wife at the Walds' former church; it discussed the sworn trial testimony, stated that "[w]e are not asking anyone to take our word, or the District Attorney's word, but to please read for yourself," and linked the transcripts. At 9:46 a.m., Natalie Wald forwarded it to Yates and her husband: "looks like Travis is picking up where his 'minions' left off. He emailed the pastor's wife from our previous church this morning." At 10:05 a.m., Yates replied: "Rafael and I were just talking about this issue. We had both thought it had stopped. Rafael and the DA's Office received numerous emails from 'Francis Gallagher' and stated I was bullying those involved. Rafael did offer to meet with 'Frank' and after that all of the emails stopped. It looks like Travis and whoever is helping him are working on covering their tracks a little better this time around." At 10:09 a.m., Natalie Wald asked: "Do we just keep forwarding anything we get to you? Or is there anything that can even be done?!" At 10:12 a.m., Yates answered: "Please forward them to me. I will speak with Rafael again and possibly write search warrants to determine who is helping him and see if there is anything those involved can be arrested for."

39. Read as written, the chain shows a Major Crimes detective of 25 years and a deputy district attorney, holding materials that showed only the distribution of public court records to third parties and no communication to any protected person, agreeing to identify the speakers' "helpers" by search warrant and then to look for "anything" to arrest them for; soliciting the speech itself from a private litigant as evidence; and treating the District Attorney's own meeting with a speaker, after which "all of the emails stopped," as a success. That same day, August 2, 2023, the Bamieh Firm filed the Wald complaint, publishing as pleaded fact the substance of the open investigation: that

AF 14900640 1 21 664

Yates "communicated with the Pleasant Valley State prison" and that "[d]uring an investigation at the prison, evidence was found on a state-issued tablet confirming" Plaintiff's claimed coordination. The warrants were not hypothetical: following the August 2023 exchange, Plaintiff received a legal-process notification from Google indicating that VCSO had obtained or served a search warrant on his Google account. No charge, no arrest, and no protective-order violation has ever resulted, because there was never any protected-person contact to find.

**C. The two Ventura actions between Plaintiff and the Walds supply every Defendant's motive, and both are cases the gag now prevents Plaintiff from litigating.**

40. Two pending actions are the ones the gag obstructs, because the Bamieh Firm and the Ball Firm are opposing counsel in them and the Wald Defendants and Cohen are the opposing parties. Each is described sufficiently to show that Plaintiff's claims and defenses in it are nonfrivolous. The other matters identified below are pleaded as background for specific events, not as actions the gag obstructs.

41. *Wald v. Martin*, Ventura County Superior Court Case No. 2023CUPP012195 (filed August 2, 2023). The Wald Defendants, P.W., and Elite Sound Company, LLC, represented by the Bamieh Firm, sue Plaintiff, his mother Donna Martin, and his companies for damages on the "deceived parents" narrative that the parents' own sworn admissions refute. Plaintiff is a defendant and cross-complainant. His defense rests on the trial record described in Section IV.A; his cross-complaint seeks recovery of the assets taken from his companies. On December 16, 2025, the court (Hon. Dana K. Caudill) acknowledged the CDCR no-contact order by name, noted plaintiffs' counsel's representation that she would ask CDCR to modify it, and recorded Plaintiff's agreement to accept service at his Ventura address. (Ex. P.) In three years the plaintiffs have propounded no discovery. The Bamieh Firm's motion to declare Plaintiff a vexatious litigant, filed August 5, 2026, was set for hearing on September 17, 2026 and has been continued to September 23, 2026.

AF 14900640 1 22-664

42. *Martin v. Wald*, Ventura County Superior Court Case No. 2024CUNP032821 (filed October 29, 2024). Plaintiff, Airlink Internet, Inc., and Entertainment Technology, LLC sue James Wald, Natalie Wald, Elite Sound Company, LLC, and Cohen on thirteen causes of action alleging that, while Plaintiff was incarcerated, they defrauded Plaintiff and his companies of assets exceeding two million dollars, including the November 26, 2022 coerced sale of Entertainment Technology's assets for $215,000 against a $1,438,000 value. The Ball Firm defends. Trial is set for November 30, 2026. The nonfrivolous character of the claims is established by James Wald's own trial admissions of the ownership split, the equipment value, and his takeover of "100 percent operations" the moment Plaintiff was jailed (paragraph 32). The court (Hon. Ben Coats, Department 43) denied Plaintiff's motion to disqualify Ball on December 30, 2025 but "direct[ed] the Office of Ball and York to contact CDCR regarding modification of the no contact order, allowing the parties to communicate about issues related to this litigation"; on March 20, 2026 denied Plaintiff's motion to restore meaningful access to the courts while ordering electronic service as a workaround and relieving the parties of meet-and-confer obligations; and on June 15, 2026 ordered that "service to Plaintiff Travis Edward Martin be made at 1746-F South Victoria Ave, Suite #104, Ventura, CA 93003, instead of the prison." (Ex. P.) The Ball Firm's motion to declare Plaintiff a vexatious litigant, filed August 21, 2026 and mailed to the prison in violation of that order, is set for hearing on October 7, 2026. The court has ruled that the Ball Firm must withdraw that motion if the court in the 2023 Ventura action grants the Bamieh Firm's motion.

43. Background matters. *Martin v. Colby*, Ventura County Superior Court Case No. 2025CUDF048144 (filed July 28, 2025), was a defamation action arising from statements about the transcripts, which Plaintiff dismissed on December 12, 2025 after the court (Hon. Mark S. Borrell) ruled that his remedy for the CDCR barrier lay against CDCR and the Warden, as recorded in the certified transcript described in paragraph 106; the court's February 26, 2026 award of $6,735 in anti-SLAPP fees is on appeal,

AF 14900640 1 23-664

Court of Appeal Case No. B353855. *Martin v. Ventura Missionary Church Corporation*, Ventura County Superior Court Case No. 2026CUDF058963, a defamation action against the church and its officials, is the action in which Plaintiff's subpoena to VCSO produced the February 24, 2026 "investigation is concluded" letter and the April 2026 Yates declarations described in Section IV.R; the church's February 7, 2025 email to its families had assured parents that the school "worked closely with our school lawyer and the detective involved in this case whenever these lies have surfaced," and Yates is that detective. *In re Martin*, San Diego County Superior Court Case No. 25CU028737C, is Plaintiff's verified petition, filed June 3, 2025, to preserve body-camera and surveillance evidence of the March 20, 2025 retaliatory search ordered by Captain Lewis; its August 8, 2025 hearing was lost because Plaintiff was in the RHU, the minute order recording "No appearances made at today's hearing." (Ex. W.) Plaintiff also prosecutes *Martin v. U.S. Small Business Administration*, C.D. Cal. No. 2:26-cv-03714-WLH-DFM.

44. Every Private Defendant had a concrete litigation and financial motive to silence Plaintiff: he was the defendant and cross-complainant in the Walds' action and the plaintiff in the fraud action against the Walds and Cohen; his public-records campaign was damaging; trial in the fraud action was approaching; and the gag, once procured, converted both cases into ones Plaintiff could not litigate and every missed step into "evidence" that he is vexatious.

**D. The 2025 report landed at an institution whose captain had already threatened to "get rid of" Plaintiff, whose warden had notice and did nothing, and whose culture of retaliatory discipline is a matter of federal adjudication.**

45. Plaintiff has been continuously engaged in civil litigation, administrative grievances, court filings, and lawful public commentary on matters of public concern. That activity is protected by the Speech and Petition Clauses of the First Amendment and by article I, sections 2 and 3 of the California Constitution.

46. Before August 2025, Plaintiff pursued administrative and legal process concerning threats and retaliation by CDCR officials at RJD, including Correctional

AF 14900640 1 24-664

Captain Andre Lewis. Lewis told Plaintiff that he would "get rid of" Plaintiff "the first chance he got," and Plaintiff reported that threat. On March 17, 2025, Plaintiff filed grievance No. 712586 challenging staff use of personal internet on duty, a grievance that would cost every employee on the facility, Lewis and Lieutenant Godinez included, their personal internet access at work. Three days later, on March 20, 2025, Lewis personally ordered, and Godinez executed, a search of Facility B premised on a falsely reported missing scalpel. Plaintiff was held in behind-the-back mechanical restraints, in extreme pain, for nearly two hours; his privileged legal documents were read; his lawfully possessed personal property was taken and damaged; and his cell was searched for nearly two hours while the other cells in the unit were searched for fifteen to twenty minutes each, roughly four times longer than any other. Godinez named the motive to Plaintiff's face, referencing his grievance record: "Well you seem to be good at 602's, so you know what to do." Lewis then told staff and incarcerated persons that Plaintiff had lied about Lewis ordering the search, working to brand Plaintiff a liar among the very staff who would later process the August 2025 charge. On June 3, 2025, Plaintiff filed a verified petition in the San Diego County Superior Court, Case No. 25CU028737C, to preserve the body-worn camera and surveillance evidence of that search for an anticipated Bane Act action against Lewis and Godinez. (Ex. R.)

47. Acevedo's notice did not begin with the August 18, 2025 letter described in Section IV.I. He knew of Lewis's and Godinez's histories of misconduct and took no step to supervise, discipline, or remove either man, and in the four months preceding the March 2025 incident he made a single visit to Plaintiff's housing unit despite the weekly inspection requirement of California Code of Regulations, title 15, section 3384. No corrective action followed the March 2025 retaliation. Ball's July 23, 2025 report therefore did not land at a neutral institution. It landed in a chain of command that had already threatened and retaliated against Plaintiff for exactly this protected activity, and the officer who classified the resulting RVR on August 11, 2025, while Plaintiff sat in the RHU, was Captain Lewis himself, the official Plaintiff's pending preservation

AF 14900640 1 25-664

petition targeted. Lewis sat in judgment of a charge against the man whose petition accused Lewis of ordering the March 2025 retaliation, and he classified the charge rather than recuse.

48. The threat Lewis delivered, and the retaliation that followed, did not occur at an ordinary institution. RJD operates under federal remedial orders entered after a federal district court found, and the Ninth Circuit affirmed, that the "root cause" of ongoing rights violations at RJD is CDCR's "systemic and long-term failure" to "effectively investigate and discipline" staff misconduct, sustained by "the deeply ingrained staff culture at RJD of looking the other way, so to speak, whenever staff misconduct occurs or is alleged by an inmate," a culture "enforced through retaliatory acts by staff" against those who report misconduct. (*Armstrong v. Newsom*, 484 F. Supp. 3d 808, 832-833 (N.D. Cal. 2020), aff'd, 58 F.4th 1283 (9th Cir. 2023).) Those findings rest on CDCR's own records: in December 2018 a CDCR strike team interviewed 102 RJD prisoners, who reported that staff "retaliated against inmates who reported the abuse with further abuse or by making false allegations against them so that the inmates would be subjected to disciplinary action"; forty-eight provided "actionable" allegations and only two resulted in any discipline; and CDCR's own Chief Ombudsman reported to headquarters, "I have never heard accusations like these in all my years." (*Id.* at 819-822.) The court found that investigations of staff misconduct at RJD were "incomplete, unprofessional, and biased against incarcerated complainants and witnesses," that inmate testimony was "discounted or ignored," and that an RJD officer "threatened the class member to charge him with a false rules violation report (RVR) if he filed a grievance about the incident." (*Id.* at 821-822, 826.)

49. Those orders remain in force. The September 8, 2020 remedial order, affirmed as to RJD, required CDCR to equip all RJD correctional officers with body-worn cameras, to install surveillance cameras covering all areas accessible to incarcerated people, to reform its staff complaint, investigation, and discipline process, and to submit to monitoring by a court-appointed expert. (*Armstrong*, 484 F. Supp. 3d at

AF 14900640 1 26-664

836-839.) The cameras have been operational, and the court expert's monitoring has continued, throughout the events alleged in this pleading. Every act alleged here, from the August 4, 2025 Litigation Office referral through the RHU placement, the disciplinary conviction, the grievance denials, and the continuing no-contact directives, occurred at an institution under active federal court monitoring for precisely this conduct: false reports, retaliatory discipline, and investigations that credit the accusation and ignore the record. Plaintiff pleads the *Armstrong* findings both for what they establish about the institution and for what Macomber and Acevedo knew about it when the notices described below reached them.

50. The same names recur in this Court. In *Goodlow v. Estrada*, No. 3:24-cv-01490-AJB-SBC (S.D. Cal.), another RJD prisoner alleged that on April 25, 2024, Captain Lewis and Lieutenant Reese justified an officer's excessive force by falsifying and approving a Rules Violation Report; the court's January 22, 2025 screening order recites those allegations. That Captain Lewis is the Andre Lewis who threatened to "get rid of" Plaintiff, whom Plaintiff's June 3, 2025 verified preservation petition targeted, and who classified Plaintiff's RVR on August 11, 2025; that Lieutenant Reese is the Reese who conducted Plaintiff's grievance interview and advanced the false claim, described in Section IV.N, that substantial evidence showed emails to Bamieh & De Smeth. In *Matheis v. CDCR*, No. 3:20-cv-2100-GPC-AHG, 2021 WL 37719, at *4-5 (S.D. Cal. Jan. 5, 2021), an RJD prisoner alleged that Sergeant C. Godinez answered a property grievance with a cell search, a forced retraction under threat of administrative segregation, and, after the prisoner reported him, "false and confidential information" entered into the prisoner's C-file; the court held that those allegations stated a First Amendment retaliation claim. On information and belief, that officer and the Lieutenant Godinez who searched Plaintiff's cell in 2025 are the same person, and the method alleged there is the method used on Plaintiff. In* Reed v. Buckel*, 2024 WL 2158266 (S.D. Cal. May 14, 2024), a deaf RJD prisoner alleged that Associate Warden S. Steadman "generated and approved" a false report stating that he had "elected not to

AF 14900640 1 27-664

participate" in a disciplinary hearing he was not permitted to attend; the court observed that the report says on one page that the prisoner refused to attend and on another that he attended. Steadman is the S. Steadman who, as Reviewing Authority, signed the December 16, 2025 decision denying Plaintiff's grievance and repeating in writing that the emails "appear to be sent directly to the Law Office of Bamieh & De Smeth."

51. Eustaquio, Reese, Louie, and Acevedo appear together in 2026. In *Flournoy v. Acevedo*, No. 3:26-cv-00229-WQH-DEB (S.D. Cal., filed Jan. 8, 2026), an RJD prisoner who is an ADA elder alleged that officers used force on him during a restraint, that Sergeant Eustaquio watched with his hands on the prisoner's body and refused his demands for emergency medical care, and that Lieutenant Reece, Sergeant Louie, and Warden Acevedo bore responsibility for it. In *Castro v. Gipson*, No. 3:24-cv-0789-DMS-DEB, 2024 WL 4111042 (S.D. Cal. Sept. 6, 2024), an RJD prisoner sued Eustaquio and Warden J. Hill, the addressee of Ball's July 23, 2025 letter, alleging that an ISU search was followed by an RVR built on "false evidence," by a retaliatory second search for "exercising his right to file administrative appeal[s]," and by eight grievances "improperly denied". (*Castro v. Gipson*, 2025 WL 897441 (S.D. Cal. Mar. 24, 2025).) And in *Thompson v. Taboada*, 2025 WL 3014552 (S.D. Cal. Oct. 28, 2025), Litigation Coordinator E. Taboada, the Elizabeth Taboada to whom the Bamieh Firm's December 26, 2025 modification request was addressed, was alleged to have "refused to assist" a prisoner in locating a law firm's mail that RJD staff lost.

52. RJD retaliation claims that reach a record survive it. In *Jackson v. Romero*, 2019 WL 3288957 (S.D. Cal. July 22, 2019), the court denied summary judgment on First Amendment retaliation and excessive force claims against two RJD Facility C officers who beat a prisoner after his grievance against a third officer, on a record in which that third officer had told the prisoner that RJD's officers "were 'dirty cops' and the officers make things up to get prisoners off the yard and place false charges on them for placement in administrative segregation." In *Hoyt v. Valdovinos*, 2020 WL 5257854 (S.D. Cal. Sept. 3, 2020), the court denied summary judgment on exhaustion because

AF 14900640 1 28-664

RJD officials "thwarted the effective invocation of the administrative process through threats, game-playing, or misrepresentations," on evidence that officers told a prisoner that if he filed an excessive-force complaint "8 cops would say that I attempted to assault a cop," placed him in administrative segregation hours later for "battery on a peace officer," coerced a recantation on video, and sent an officer to tell him to "drop the excessive force claim."

53. Most of the complaints described above were dismissed at screening, for Rule 8, for *Iqbal*, for the absence of a *Sandin* liberty interest, or for an unpaid filing fee. Not one was decided against the prisoner on evidence. An unrepresented prisoner's inability to plead a complaint to a federal pleading standard says nothing about whether his account is true, and it does not erase what the dockets of this Court show when they are read together: the same officers, Lewis, Godinez, Eustaquio, Reese, Servantes, Steadman, Louie, and Taboada, accused by prisoner after prisoner, year after year, of the same instruments used on Plaintiff, a manufactured accusation, a search staged as an interview, a segregation cell, a confidential source, a false entry in the file, a hearing record that recites a waiver the prisoner never gave, and grievances that vanish. Plaintiff pleads these cases as what they are, the sworn or verified allegations of other prisoners and the findings of the courts that made findings, and pleads that every one of them was known to Macomber and Acevedo, who are served with each screening order and each judgment in their official capacities, before the Ball Firm's letter reached RJD in July 2025. The *Armstrong* court found the culture; these dockets name the people.

**E. Two litigation emails to opposing counsel, transmitted through a chain CDCR itself approved.**

54. On July 17, 2025, at 7:31 a.m., Plaintiff sent a message on his CDCR-issued tablet to his mother, Donna Martin, a free citizen; CDCR's monitoring system reviewed it and marked it "Reviewer: Auto Approved." (Ex. C.) At Plaintiff's instruction, Donna Martin then sent two emails to Ball and Ball Firm personnel from a Gmail account outside CDCR's system, captioned "Martin, et al. v. Cohen, et al.," the

AF 14900640 1 29-664

caption of the 2024 Ventura action: the first on July 17, 2025 at 7:44 a.m., the second on July 18, 2025 at 3:57 p.m., after Ball had replied at 2:40 p.m. that Plaintiff's "friends and family" should "seek legal advice from a real lawyer before pursuing your anticipated threat." (Ex. D.) The July 17 email told Ball that Plaintiff's "friends and family will begin posting reviews and buying video advertising across all social media platforms detailing you and your firm's representation of self-admitted child sex traffickers." The July 18 email linked a public video, stated that "[t]he same producer is preparing yours" and that it "will include your name, your face, and the faces of your law partners," told Ball that "[y]ou seem to be arrogant, as if some legal action will save you," and said that "[b]y the time you attempt to recover any damages from anyone your firm will already be destroyed." Plaintiff has never denied that both emails were sent at his direction. He said so to the investigating sergeant on August 5, 2025, and he wrote in his September 10, 2025 defense statement that they were "sent at my instruction to attorney Allen Ball and his firm Ball & Yorke." (Exs. F, K.) The only communication CDCR ever located inside its own system was the tablet message to his mother that CDCR itself had approved.

55. Both emails concerned pending litigation, criticized opposing counsel's representation choices, and described lawful reputational and economic consequences: reviews, advertising, public commentary, and legal action. Neither threatened violence. Neither was addressed to Bamieh & De Smeth. Neither was addressed to any victim or family member. Speech does not lose its protection because it embarrasses its target or pressures him through social, economic, and reputational consequences (*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909-911 (1982)), and a true threat requires a serious expression of intent to commit unlawful violence made with at least reckless awareness of its threatening character (*Counterman v. Colorado*, 600 U.S. 66, 69-70, 74 (2023)). The Ninth Circuit has applied those rules to emails materially harsher than these: messages demanding that an adversary right claimed wrongs on pain of public exposure, promising to "expose you wherever you go," and warning that the campaign

AF 14900640 1 30-654

would continue, are protected speech, not true threats. (*Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 745-748 (9th Cir. 2021).) And a prisoner's announcement that he will sue, or will complain to the authorities, is itself protected petitioning; "explicitly articulating that threat as a precursor to initiating civil litigation does not suddenly make that threat more intimidating or coercive." (*Entler v. Gregoire*, 872 F.3d 1031, 1039, 1042-1043 (9th Cir. 2017).) Nothing in these emails approaches the line. And the emails were sent by a free citizen from an account outside the prison; CDCR had no jurisdiction over Donna Martin's decision to send them.

**F. Ball recycled Bamieh's letter and captioned two emails to himself as "Harassment of Victim's Family."**

56. Five days after the second email, on July 23, 2025, Ball wrote to RJD Warden James Hill on Ball Firm letterhead under the identical caption Bamieh had used in 2023, "Electronic Harassment of Victim's Family by Inmate." (Ex. E.) The letter stated that Ball's office "represents Natalie Wald, James Wald and Jason Cohen"; that "Mr. Martin is engaged in a wave of harassment, including harassing me through electronic means"; that the enclosed "threatening letter" included "a link to a defamatory YouTube video and rather discuss threats to intimidate me"; that "the family is very upset with these vulgar and untrue statements that are being circulated to members of the family and the community"; that Plaintiff's pending lawsuits, including the fraud action Ball was defending, were "brought solely for the purpose of avenging imagined wrongs"; and that "Ventura County Sherrif Detective Yates has also been dealing with the harassment the inmate has inflicted upon his victims." It closed with Bamieh's demand, now framed as a reprise: "We once again request an internal investigation into Mr. Martin's use of electronics in your facility to terrorize victims and family. We hope that you may institute some form of discipline or prosecution to prevent this ongoing harassment."

57. The letter was knowingly false in its essential characterizations. Its caption and text reported harassment "of Victim's Family" and "of victims," yet the only

AF 14900640 1 31-664

communications Ball enclosed were the two emails his own firm received about its own conduct in pending litigation; the enclosures disproved the caption. No Wald family member had been contacted. Nothing in the emails was "circulated to members of the family and the community"; they went to Ball. Ball invoked Yates by name to lend law-enforcement weight to an accusation Yates's own file did not support. He designed the caption to trigger the victim-safety machinery of a state prison against an opposing litigant, and "[w]e once again request" admitted what the documents show: a second installment of a single continuing campaign, coordinated with the Bamieh Firm, to procure state discipline against a shared civil adversary.

**G. August 4 and 5, 2025: a false "notification," a same-evening evidence handoff, a laundered "confidential source," a Mirandized interrogation, a threat of prosecution, and solitary confinement.**

58. On August 4, 2025, at approximately 5:27 p.m., RJD's Investigative Services Unit received a "notification from the Litigation Office at RJDCF indicating that Incarcerated Person (IP) MARTIN, T., CDCR# BU6031, has been sending threatening emails to the Office of Attorney Bamieh & De Smeth and the victim's family." (Ex. F.) The Litigation Office transmitted and adopted the Ball Firm's accusation, and in doing so made it worse: it attributed the emails to the wrong law firm and added the "victim's family." No email to Bamieh & De Smeth and no email to any victim or family member existed then, and none has been produced since. The referral's origin in the Litigation Office, not in any security unit, confirms that the matter was treated from inception as a litigation-management problem for the benefit of Plaintiff's adversaries.

59. Thirty-five minutes later, at 6:02 p.m., Natalie Wald forwarded the August 2, 2023 Yates email chain to Ball, Lauren White, and Cathy Hernandez at the Ball Firm, and to James Wald. The Ball Firm printed it at 11:48 a.m. on August 5, 2025, while CDCR was writing the charge. (Ex. B.) The Wald Defendants supplied, and the Ball Firm assembled and transmitted to CDCR, materials from the Yates investigation to

AF 14900640 1 32-664

bolster the accusation, in coordination with the Bamieh Firm, whose 2023 letter became Attachment #1 to the charge.

60. CDCR simultaneously laundered the attorney report into anonymous intelligence. On August 5, 2025, Lieutenant Servantes ordered Plaintiff's placement in the Restricted Housing Unit, checking the boxes for "presents an immediate threat," "jeopardizes integrity of an investigation," and "endangers institution security," and reciting that "[o]n August 4, 2025, confidential information was obtained from a confidential source (CS #1), indicating your alleged involvement in illicit serious misconduct, specifically, criminal threats against individual(s) in the community." (Ex. G.) A Confidential Information Disclosure Form issued the same day, checking only "Other" under reliability and stating that the information "necessitat[ed] further investigation to assess its credibility." "CS #1" was the Ball Firm's letter and its transmittal: an unsworn adversary's demand recast as a confidential source of "criminal threats," a designation that stripped Plaintiff of any ability to confront his accuser and that title 15 permits only for information whose disclosure would endanger someone. (Cal. Code Regs., tit. 15, § 3321, subds. (a), (b).) An attorney's letter endangers no one. The hearing results later marked "Confidential Information Used: No." (Ex. L.)

61. The "investigation" began and ended in a single morning. Eustaquio's narrative records that at approximately 9:52 a.m. on August 5, 2025, he interviewed Plaintiff after a *Miranda* advisement and signed waiver; that Plaintiff "confirms that he authorized the emails to be sent by Donna Martin," explained that "the emails were not wrong, and they threatened legal action for their unlawful conduct," and, asked whether he would continue, answered "100%"; that Eustaquio "ordered IP MARTIN not to contact, harass and/or annoy the Office of Attorney Bamieh & De Smeth and the victim's family via telephone, mail, email, text, social media networks, nor by any third party"; that "[i]f IP MARTIN does not cease all communication with the aforementioned civilians, RJDCF-ISU will immediately seek action with the San Diego District Court and file charges for harassment under Penal Code 646.9"; and that "IP MARTIN will not

AF 14900640 1 33-664

receive another warning." At approximately 1:00 p.m. Eustaquio "concluded" the investigation and issued RVR Log No. 7636056, charging "Harassment of another person" under title 15, section 3005(a), classified Serious, Division F, and opened Unit Investigative Report No. RJD-INV-25-08-057. The same form, in the classification block CDCR itself completed, recorded: "FELONY PROSECUTION LIKELY: No." (Ex. F.) Lieutenant Louie approved the RVR at 1:29 p.m., four minutes after it was submitted. Captain Lewis classified it on August 11, 2025. (Ex. L, Actions Taken.)

62. The threat was legally incoherent and transparently coercive. The "San Diego District Court" is this Court; state harassment charges are filed by the District Attorney in the Superior Court; the form on which the threat was written certified that felony prosecution was not likely; and the conduct threatened with prosecution was communication with civilians about civil litigation. It was not a warning. It was an order to stop petitioning, backed by the threat of a criminal case. The RHU placement was punitive, not investigative: an investigation that concludes at 1:00 p.m. on its first day cannot justify thirty days of segregation, and CDCR left Plaintiff his tablet, with its messaging function, throughout the thirty days. An administration responding to claimed criminal threats transmitted by tablet does not leave the tablet in the accused's hands. CDCR confined the man and left him the device because the object was punishment for protected litigation speech not any legitimate investigative purpose.

63. The timing forfeited a court hearing. Plaintiff's verified petition to preserve the camera evidence of Lewis's March 2025 search was set for hearing in the San Diego Superior Court on August 8, 2025. Confined in the RHU, Plaintiff could not appear; the minute order records "No appearances made at today's hearing," and the matter was taken off calendar. (Ex. W.) Three days later Captain Lewis, the target of that petition, classified the charge against the man who had filed it. He did not recuse. He did not release Plaintiff.

AF 14900640 1 34-664

**H. Three days in an intake cell without water: the physical injury, and the Warden's notice of it.**

64. From August 5, 2025 through August 8, 2025, CDCR held Plaintiff in an RHU intake cell that had no running water, and no drinking water was brought to him. For those three days Plaintiff was not provided regular meals; the food that was provided was provided irregularly and without utensils. In a concrete cell in August, Plaintiff went without adequate water for three days and without adequate food for three days, and he became dehydrated.

65. The dehydration was a physical injury to Plaintiff's body, and its symptoms were physical, progressive, and painful. Beginning on the first day and worsening through the third, Plaintiff suffered intense and unrelenting thirst; a dry mouth, dry and cracked lips, and a thick, dry tongue; a persistent headache that intensified with each day without water; dizziness and lightheadedness that became worse when he stood; fatigue and physical weakness that made it difficult to stand, move, and remain upright; muscle cramps; a rapid heartbeat; markedly reduced urination, with urine that was dark and concentrated when he was able to urinate; dry skin; nausea; difficulty concentrating; and an inability to sleep. The hunger was likewise physical: hunger pains and stomach cramping, shakiness, and a compounding weakness and lightheadedness from the lack of food. The headache, fatigue, weakness, and cramping continued for days after water was restored on August 8, 2025, and Plaintiff's physical recovery from the three-day deprivation extended into the remainder of his confinement. Those symptoms were injuries to his body, not mental or emotional states; each was more than de minimis; and each was inflicted by the same officials, for the same reason, and in the same cell as the confinement itself.

66. Those conditions did not mirror the conditions of ordinary administrative segregation at RJD, where cells have running water and meals are served on schedule; they were materially worse. They were inflicted on a prisoner who had been charged with nothing, on the strength of an attorney's letter recast as a confidential source, and

AF 14900640 1 35-664

they were reported in writing to the Warden on the second day. No official checked the cell, restored the water, brought food, or answered.

67. The Warden knew. On August 6, 2025, at 8:07 a.m., Plaintiff's counsel, Alexander S. Kasendorf, emailed the RJD Litigation Coordinator, copying Captain Lewis, and re-sent the same demand at 9:21 a.m. with a copy to Acevedo at his correct CDCR address: "Demand is hereby made that Mr. Martin be immediately returned to his previous housing at B9-249. Any allegations or accusations of threats made towards Mr. Ball are false. Mr. Martin was exercising his rights as a litigant in matters with Mr. Ball's clients and any retribution violates his right of free speech. These are civil matters unrelated to his incarceration. Please let me know ASAP that this was handled." (Ex. H.) Litigation Coordinator Freddy Gomez answered at 3:15 p.m., copying Lewis and Acevedo, that "any and all allegations or acquisitions of threats brought our attention are taken seriously, therefore at this time we are carefully looking into this matter." At 3:27 p.m. counsel asked Gomez to "provide me with the alleged threats." At 4:21 p.m., again copying Acevedo and Lewis at their correct CDCR addresses, counsel wrote: "Also, I understand Mr. Martin does not have water or other life necessities. I strongly urge you to return him to his housing accommodations ASAP. Any investigation can continue but this is a civil matter not subject to his current punishment." No one answered. On August 7 at 7:31 p.m. counsel wrote: "Any updates? There is no need for this. Please return him ASAP and the rest can be worked out." On August 8 at 12:49 p.m.: "I understand you are keeping him in solitary until Thursday. There is no valid reason for this. Respectfully, please consider releasing him sooner." On August 12 at 10:25 a.m.: "Is this possible?" No reply of any kind came from Gomez, Lewis, Acevedo, or anyone else after the 3:15 p.m. message of August 6. (Ex. H.) The Warden of the institution was told in writing, on the second day, that a prisoner in his custody had no water, and he left him there.