AF 14900640 1 36 664

**I. On August 18, 2025, Macomber and Acevedo received formal written notice, a demand for correction, and a litigation hold, and did nothing.**

68. On August 18, 2025, thirteen days into the confinement, counsel sent a formal written demand by Federal Express and by email to CDCR's Office of the Secretary, Office of the Ombudsman, and Office of Legal Affairs in Sacramento, with copies to Secretary Macomber, Warden Acevedo, Ronald Broomfield, and the RJD Litigation Coordinator. (Ex. I.) The letter objected to and demanded "immediate correction of the improper placement of Mr. Martin in the Restricted Housing Unit (RHU) under 'protective custody'"; stated that "[s]taff have claimed that Mr. Martin is under investigation for alleged 'criminal threats' against someone in the community. However, the allegation is baseless. The supposed 'threat' email . . . contains nothing more than constitutionally protected First Amendment speech concerning negative reviews of a business. It is facially evident that the email contains no criminal threat whatsoever. The Department has no lawful authority to involve itself in civil disputes or interfere with protected speech"; documented that the retaliation had been "predicted and documented months ago" in Plaintiff's petition quoting Lewis's threat to "get rid of me the first chance he got"; identified the RHU committee's imposition of Privilege Group D disciplinary status without any charge or hearing; observed that "[t]he complainant, Mr. Ball, resides approximately 200 miles away," so that general-population housing "poses no risk or interference with any alleged investigation"; and demanded immediate removal from the RHU, reinstatement of privilege group, written assurance that retaliation would cease, and "[p]reservation of all records and communications related to his placement, as they may be subject to future litigation," warning that "[f]ailure to promptly remedy this matter will result in the pursuit of all available legal remedies, including federal civil rights litigation."

69. Macomber and Acevedo were not free to ignore that notice. The Penal Code vests in the Secretary "the responsibility for the care, custody, treatment, training, discipline and employment of persons confined" in the state prisons (Pen. Code, § 5054);

AF 14900640 1 37-664

title 15 makes the Warden "responsible for the custody, treatment, training and discipline of all incarcerated persons under his charge" (Cal. Code Regs., tit. 15, § 3380, subd. (a)) and makes "[e]very employee, regardless of his or her assignment, . . . responsible for the safe custody of the inmates confined in the institutions of the department" (*id.*, § 3271); and the Penal Code places every prisoner "under the protection of the law" against "any injury to his person, not authorized by law" (Pen. Code, § 2650). As of August 18, 2025, both officials had actual, written, particularized knowledge that a prisoner in their charge was confined in solitary on a baseless accusation, in documented retaliation, without charge or hearing, and had gone without water, and they had a preservation demand and a litigation warning in hand. They did nothing: no removal, no reinstatement, no assurance, no response. With the Secretary and the Warden on notice, the machinery accelerated: the investigative employee interview on August 24; Ball's evidence offer to the investigator on September 5; the hearing on September 17; the affirmance on October 15. Their inaction was not oversight. It was acquiescence with full knowledge, by the two officials responsible for an institution under federal monitoring for exactly this conduct.

**J. The RVR charged emails that do not exist, and the Private Defendants reported them to law enforcement.**

70. RVR Log No. 7636056 rested on demonstrably false predicates. It charged that Plaintiff "has been sending threatening emails to the Office of Attorney Bamieh & De Smeth and the victim's family" and asserted that "[t]he email messages appear to be sent directly to the Law Office of Bamieh & De Smeth via email." (Ex. F.) The emails reproduced in the same document print Ball Firm addresses in their headers. CDCR produced no email to Bamieh & De Smeth and no email to any victim or family member. Eustaquio's own tablet review found one prison-originated communication, the July 17 message to Donna Martin that CDCR had approved, and his own conclusion, that "Donna Martin conspired in the harassment by sending the email messages to the Law Office on MARTIN's behalf," concedes that the emails were sent by a free civilian

AF 14900640 1.38.664

from an account outside CDCR's system. The RVR also misquoted the governing definition: it recited that "[h]arassment means a willful course of conduct directed at a specific person, group, or entity which seriously alarms, annoys, or terrorizes," omitting the element the evidence could not satisfy, "and which serves no legitimate purpose."

71. The entire evidentiary universe of RVR Log No. 7636056 is two emails, sent by a free citizen from a Gmail account outside CDCR's system, to one law firm. The July 17, 2025 email went to Cathy Hernandez at Ball & Yorke, copying Allen Ball and Lauren White; the July 18, 2025 email went to Ball, copying the same two employees; Ball answered it that afternoon. (Exs. B, C, D.) There is no email to Bamieh & De Smeth. There is no email to James Wald, to Natalie Wald, or to any member of the Wald family. Plaintiff said exactly that at the hearing, in writing: the packet "does not contain a single email to Bamieh & DeSmeth or to any member of the Wald Family," and the Gmail headers in CDCR's own exhibit identify Ball Firm personnel as the recipients. (Ex. K.) No one answered it, at the hearing or at any level of review, because the record admits of no answer. The charged predicate, harassment of "the Office of Attorney Bamieh & De Smeth and the victim's family," therefore fails on CDCR's own evidence, and the finding of harassment of two law firms is unsupported by a single document in the file.

72. The investigation that produced the charge took a statement from no one. Neither Eustaquio's narrative nor the investigative employee's report records an interview of James Wald, Natalie Wald, P.W., any attorney or employee of Bamieh & De Smeth, any attorney or employee of the Ball Firm, the Litigation Office personnel who made the "notification," Yates, or Donna Martin; neither authenticates either email; and neither contains a statement by any person that he or she feared for anyone's safety. (Exs. F, K, L.) Plaintiff told the hearing officer in writing that the packet contained "no witness statements" and "only an adversary's complaint letter from two years ago," and asked that the charge be dismissed for want of the evidence title 15 requires. (Ex. K.) The answer was a sham guilty finding.

AF 14900640 1 39 664

73. Taken at face value, the same two emails are protected activity. They notified opposing counsel of an intended civil action and of a State Bar complaint, and they stated that Plaintiff's family would publish criticism of the firm's representation. Petitioning and public criticism of a lawyer's conduct of litigation are protected by the First Amendment, and Title 15 excludes from "harassment" any course of conduct that "serves a legitimate purpose" (the element Eustaquio intentionally deleted from his recitation of the rule). Protected activity cannot constitute "some evidence" of a disciplinary offense. That is why the supposed admission adds nothing: what Plaintiff acknowledged in the August 5, 2025 interrogation was authorizing emails to opposing counsel about pending litigation, and what the Office of Appeals converted into an intent to "not stop making contact" was a statement that he would continue to litigate and to speak. An admission to exercising a right is not evidence of a violation; it is evidence of what these Defendants set out to punish.

74. The Investigative Services Unit is the institution's police force. ISU investigates crimes committed within and from the institution, assigns criminal case numbers (this matter was Unit Investigative Report No. RJD-INV-25-08-057), gathers and books evidence, and refers completed investigations to the District Attorney; its sergeants and correctional officers are peace officers whose authority extends to crimes committed at the institution (Pen. Code, § 830.5). Eustaquio's own conduct proves the point: he administered *Miranda* warnings and obtained a signed waiver before questioning, a procedure that exists for custodial interrogation by law enforcement in a criminal investigation; he threatened prosecution under Penal Code section 646.9; and he later confirmed in writing that "[t]he authority to file criminal charges rests with the San Diego County District Attorney's Office. My role is to report the crime that I have investigated and forward the case to the District Attorney's office for review and prosecution." (Ex. K.) A unit whose officers hold peace-officer authority, whose files are criminal investigation files, and whose product is prosecution referrals is a law enforcement agency within the meaning of Civil Code section 47, subdivision (b)(5),

AF 14900640 1 40 664

under any construction of that term, and the Legislature's own usage confirms it (Gov. Code, § 7923.600 ["state or local agencies designated for correctional, law enforcement, or licensing purposes"]). The same accusations also reached recipients as to whom no construction is needed: Yates, a peace officer under Penal Code section 830.1, and, on information and belief, the District Attorney's office through Orellana, whose involvement Ball himself announced in open court on February 17, 2026: "And the District Attorney has gone after this a couple of times."

75. A knowingly false report of crime to a peace officer is itself a crime. Penal Code section 148.5, subdivision (a), makes it a misdemeanor to report to a peace officer described in section 830.1 or 830.2, or to a district attorney or deputy district attorney, "that a felony or misdemeanor has been committed, knowing the report to be false"; subdivision (b) extends the same rule to a report to "any other peace officer" while engaged in the performance of his duties, where the reporter knows or should know the recipient is a peace officer. Every element is met as to Ball and the Ball Firm: the July 23, 2025 letter reported that Plaintiff was engaged in "harassment" and "terroriz[ing]" of "victims and family" through "threatening" communications, conduct constituting offenses under Penal Code sections 646.9 and 653.2, and demanded "prosecution"; it was directed to and received by ISU peace officers, whose sergeant testified that his "determination for the RVR was made on August 5, 2025 when I received notification from The Law Office of Ball and Yorke"; Ball then reported directly to that sergeant on September 5, 2025, addressing him as "Officer," discussing "your investigation," and offering evidence; Ball knew the report was false because his own enclosures showed the only communications went to his own firm, concerned pending litigation, threatened no violence, and contacted no victim or family member; and Ball, a California attorney corresponding with a uniformed investigative sergeant about a numbered criminal investigation, knew he was reporting to a peace officer. Bamieh and the Bamieh Firm reported "crimes" to a CDCR peace officer in May 2023 and demanded "prosecution" while holding no communication from Plaintiff to the firm or to any victim or family

AF 14900640 1.41-664

member and conceding on the face of the letter that every recipient was a third party; that letter was then resubmitted as evidence supporting the 2025 charge. The Wald Defendants and Cohen reported the same accusations to Yates and, on information and belief, to Orellana, and supplied them to the Ball Firm for retransmission to CDCR. Each acted with knowledge of falsity or, at minimum, reckless disregard: none possessed, and none has ever produced, a single communication from Plaintiff to the firm or family they reported was being harassed, and electronic harassment, had it existed, would have generated the most easily forwarded evidence imaginable.

**K. Eustaquio's written answers prove he knew there was no evidence and charged anyway.**

76. Plaintiff put the dispositive demands to Eustaquio in writing through the investigative employee and at the hearing. (Exs. K, L.) Asked to identify the emails to Bamieh & De Smeth on which the charge rests or to explain the false statement in the RVR, he answered: "The law office of Bamieh and DeSmith provided two written statements with two emails. Refer to attached documents." The attached documents are the two emails to the Ball Firm; the answer concedes there are no emails to Bamieh & De Smeth. Asked to produce all emails to and from the alleged victim's family, he answered: "Refer to written statement provided by the attorney." An adversary's letter is not an email to a victim; the answer concedes there are none. Asked to explain how Bamieh & De Smeth relates to anything in the RVR: "Refer to the report." Asked for any evidence that anyone even alleged the victim's family would be contacted: "The attorney provided a written statement," and, pressed at the hearing to identify where any letter states the victims were contacted, "The information is in the letter addressed to Warden Hill," a letter whose enclosures show contact with no one but Ball. Asked why the RVR omitted the "serves no legitimate purpose" element: "What is your question?" followed by a recitation of the very definition he had truncated. Asked for the legal authority giving CDCR jurisdiction over a civilian civil dispute about online reviews of a law firm: a recitation of Marsy's Law. Asked how communications with a plainly legitimate

AF 14900640 1 42 664

purpose could be harassment: the emails "serve no legitimate purpose, instead they were intended to terrorize and threaten the recipient with legal action." Asked for the statutorily required evidence that any person was placed in reasonable fear for their safety: "The evidence was attached to the RVR, which includes the emails," and at the hearing, "the Letter to Warden Lemon paragraph two," a two-year-old letter from a different law firm to a different prison whose second paragraph says the family was "very upset" and that postings "pose a real threat to the family's ability to generate income," and says nothing about fear or safety. Asked to state the actual basis for the charge: "My determination for the RVR was made on August 5, 2025 when I received notification from The Law Office of Ball and Yorke." Offered the sworn trial transcripts underlying Plaintiff's public statements, he refused to review them: "You were told that you can provide this evidence to the SHO."

77. That is the confession of the charging officer. The determination was not made on evidence; it was made on receipt of opposing counsel's letter. In Eustaquio's formulation, threatening lawful legal action is terrorism. An investigator who cannot identify a single communication to the charged recipients, deletes the element of the offense he cannot prove, refuses to examine exculpatory material, threatens prosecution in a court that does not file state charges, and charges anyway is not mistaken. He is executing a request by an inmates adversary.

**L. The hearing: Plaintiff appeared, pleaded not guilty, argued, and cross-examined; the hearing officer convicted on an uncharged theory while certifying that the charged proof was never submitted.**

78. Lieutenant Jones conducted the sham hearing on September 17, 2025 at 11:00 a.m. The Disciplinary Hearing Results record, on their face, that "Subject was Present, in good health and ready to proceed"; that the plea was "Not Guilty"; that "Subject made a statement"; and that Plaintiff directed follow-up questions to the reporting employee, who "could not be physical present during the hearing due to current work assignment but was made available during the hearing," with "[t]he Subject

AF 14900640 1 43-664

stat[ing] he could hear the RE through speaker phone." (Ex. L.) The template line for a refusal to attend, "Subject elected not to participate in the adjudication process by refusing to attend the hearing," is unchecked. Plaintiff filed a written Defense Statement and Motion to Dismiss at the hearing (Ex. K). Any statement, by any person or any court, that Plaintiff "elected not to attend" that hearing is false, and CDCR's own document proves it false.

79. The outcome was predetermined. To every one of Plaintiff's written questions exposing the evidentiary void, Jones appended the identical boilerplate ruling that the "emails and letters submitted into evidence by the RE established the Subject's deliberate and intentional harassment of another person," without once identifying an email to a charged recipient, because none exists. He measured the wrong party's burden: the same rulings, and the findings themselves, recite at least five times that "the Subject did not provide sufficient evidence to refute the charge against him," when title 15 permits a guilty finding only on a determination "that a preponderance of evidence submitted at the hearing substantiates the charge" (Cal. Code Regs., tit. 15, § 3320, subd. (l)) and the Penal Code commands that "the charge shall be dismissed if the facts do not support the charge" (Pen. Code, § 2932, subd. (c)(5)). He then sustained guilt on a theory never served on Plaintiff: that Plaintiff was "targeting the law firm associated with the parent's of his victim." The RVR charged emails to Bamieh & De Smeth and the victim's family; the hearing sustained guilt on emails to the Ball Firm. He located the "disorder" that section 3005(a) requires in "formal complaints to law enforcement personnel to intervene," and the "endanger[ment]" in "the complaint of the Subject defaming the noted law firms and the Subject's victims": the accusation was the disorder, and the accusation was the danger. He found "annoyance/alarming/terror" without a statement from any person claiming to have been annoyed, alarmed, or terrorized. And Jones wrote the sentence that ends the inquiry: "Although the Subject request proof that he was contacting his victim and family was not submitted into evidence, was not an element considered when establishing if the evidence against the Subject outweighs the Subject's

AF 14900640 1 44-664

argument." (Ex. L.) That sentence concedes the central evidentiary hole and declares it irrelevant. Conviction upon a charge not made, on a record that contains no evidence of the charge made, is the definition of a denial of due process.

80. Jones imposed 30 days of credit forfeiture and 30 days' loss of dayroom, telephone, and package privileges (September 17 to October 17, 2025), with classification consequences including privilege-group demotion and added custody points. He then expanded the gag beyond even the charge: "At the conclusion of the hearing, the Subject was admonished again to cease contact with Bamieh and De Smeth Professional Law Corporation, Law Office of Ball and Yorke, and the Subject's victim and family. The Subject was also informed, if his behavior continues, he will be held accountable for his options." The only authority he supplied for the communications ban was this: "Pursuant to California Rules of Court Rule 2.251 (b) - Electronic Service - There shall be an agreement of both parties to consent to electronic service when delivering or communicating for court proceedings. The evidence clearly reveals the two law firms have not agreed on electronic communication with the Subject. The Subject was instructed to communicate through the court personnel." (Ex. L.) Rule 2.251(b) is the rule under which a civil litigant may consent to electronic service. It prohibits nothing, presupposes that the parties communicate with each other directly, and creates no channel through court staff; California procedure requires adverse parties to confer with each other directly before demurrers and discovery motions (Code Civ. Proc., §§ 430.41, subd. (a), 2016.040, subd. (a)), and no statute, rule, or regulation makes court personnel a conduit between adverse litigants. Jones defined the offense by borrowing from Penal Code sections 653.2 and 646.9 and Civil Code section 1708.7, twice quoted the limitation each of those statutes contains, that "[c]onstitutionally protected activity is not included within the meaning of" a "course of conduct" or a "pattern of conduct," and never applied it. The findings' only answer to the constitutional question was that Plaintiff had not provided "sufficient evidence to substantiate his claim that annoying or orchestrating unwanted tactics towards a specific group (Law Firms associated with his

AF 14900640 1 45 664

victim) is lawful," a sentence that assumes the conclusion and puts the burden of proving the First Amendment on the prisoner. He measured the burden of proof by *Karch v. Karch*, 885 A.2d 535 (Pa. Super. Ct. 2005), a Pennsylvania domestic-relations decision. (Ex. L.) A prison lieutenant thus gagged a self-represented litigant from contacting opposing counsel in both of his cases against the Walds, at opposing counsel's request, citing a Pennsylvania family-law case and an e-filing consent rule. Captain Franckowiak, as Chief Disciplinary Officer, affirmed on October 15, 2025 without correction; the final results were served October 18, 2025. Captain Lewis, who had classified the charge on August 11 with prior involvement in the events, remained in the chain of command that reviewed it.

**M. CDCR did not preserve the recordings, and its "confidential source" paperwork contradicts itself.**

81. Plaintiff demanded the recordings in writing, before the hearing, through the investigative employee: "Produce and provide the audio recording that you made on the iphone of my interview for the hearing so your statements can be impeached." (Ex. K.) Eustaquio's written answer conceded that recordings exist and put the request on the hearing officer: "The SHO can request BWC footage of the interview." Jones neither obtained nor produced any recording. He wrote instead that he "utilized the RE's documentation within the RVR." (Exs. K, L.) The regulations do not leave that to discretion. Before a serious RVR hearing an incarcerated person "shall have the opportunity to review non-confidential portions of audio or video recording(s) which are directly relevant to their serious RVR offense"; recordings so reviewed "shall be considered as evidence and included in the disciplinary hearing process"; the hearing officer "shall not deny" that review unless the recording contains material described in section 3321, subdivision (a); and review must occur "at least 24 hours prior to a serious disciplinary hearing." (Cal. Code Regs., tit. 15, § 3315, subds. (f)(1)-(f)(3).) No confidentiality ground was available or invoked: the Disciplinary Hearing Results state "Confidential Information Used: No." (Ex. L.) The recordings were of Plaintiff's own

AF 14900640 1 46-664

interrogation, the single source of every later assertion that he confessed. Under the *Armstrong* remedial orders, body-worn cameras are mandatory for RJD correctional officers and were operational in August and September 2025; the interrogation and the RHU placement are the events those cameras exist to capture. The failure to preserve and produce them is not a records gap; it is noncompliance with a federal accountability mandate imposed because RJD's investigations could not be trusted without video. The confidential-source paperwork collapses on itself: the RHU placement rested on "CS #1"; the disclosure form rated the source's reliability "Other" and in need of "further investigation"; and the hearing results marked "Confidential Information Used: No." The designation misapplied section 3321 and served one purpose: immediate segregation while the attorney-driven case was assembled.

82. Jones also denied Plaintiff the questioning the regulations guarantee. Eustaquio did not appear. Jones reached him by speakerphone, read out a handful of questions Jones had written down, and refused to let Plaintiff question him directly or ask a single follow-up, including after the answers proved non-responsive to the demand for the emails on which the charge rested. The regulation is not discretionary: "The reporting employee shall attend the disciplinary hearing or be available for questioning via speakerphone if requested by the incarcerated person," and "[u]nder the direction of the official conducting the disciplinary hearing, the incarcerated person has the right to ask questions of all witnesses called," with the hearing officer's role limited to screening questions "to ensure they are relevant to the violation charged." (Cal. Code Regs., tit. 15, § 3315, subds. (e)(4), (e)(5).) Jones screened nothing; he substituted his own questions for Plaintiff's and closed the examination. He documented no reason, as subdivision (e)(2) requires for a denial. The two denials worked together: the officer who wrote the interview narrative was shielded from questions about it, by the officer who then adopted it, while the recordings that would have tested it were withheld.

AF 14900640 1 47-664

**N. Three levels of administrative review repeated the fabrication rather than tested it.**

83. Lieutenant Reese conducted Plaintiff's grievance interview and told him there was substantial evidence showing emails to the Law Office of Bamieh & De Smeth. No such evidence exists. The Office of Grievances decision, Log No. 830846, dated December 16, 2025 and signed by Reviewing Authority S. Steadman, repeated the falsehood in writing, asserting that "[t]he email messages appear to be sent directly to the Law Office of Bamieh & De Smeth via email," and again invoked *Karch v. Karch*. The Office of Appeals' February 27, 2026 decision recast Plaintiff's explanation of his protected litigation communications as a confession, asserting that Plaintiff "self-admits to the violation" and "will not stop making contact." (Ex. M.) Plaintiff admitted authorizing two emails to opposing counsel and explained their purpose; he admitted no violation. CDCR did not deliver the final decision to Plaintiff until March 23, 2026. Three levels of review repeated one fabrication, verbatim and then embellished. That is the "deeply ingrained" pattern the *Armstrong* court found at RJD, operating exactly as found.

**O. Ball operated as an arm of the investigation, shaped the gag, told a court the District Attorney was involved, and in May 2026 admitted his purpose in writing.**

84. On September 5, 2025, at 1:38 p.m., twelve days before the hearing, Ball emailed Eustaquio directly, copying Cathy Hernandez and Lauren White, under the subject "Re: Correspondence RE-MARTIN BU6031": "Officer Eustacia: I have instructed staff to compile the various potentially relevant correspondence. I anticipate that may take a day or two. If you have a schedule to adhere to and need immediate attention we shall make every effort to accommodate you." He continued: "I am dealing with one, possibly two civil cases filed by Mr Martin against the parents of the minor victim asserting he is the victim and the parents are child traffickers because the parents initially believed the pedophiles' denials of sexual molestation. He apparently found

AF 14900640 1 48 664

victims through churches praying on those who believe in goodness and redemption," catalogued five of Plaintiff's civil filings by case number as grievances, and closed: "I will call you personally when I have compiled documents that may be relevant to your investigation. In the interim please let me know if you are working under time constraints." (Ex. J.) The "churches" narrative was knowingly false: Ball's own client, Natalie Wald, testified under oath that she met Plaintiff through his parents, in a family setting, eleven or twelve years before. The "initially believed the pedophiles' denials" narrative was refuted by both Walds' sworn admissions (Section IV.A), and Ball knew it when he wrote it. He has litigated against the trial transcripts throughout the 2024 Ventura action; on August 14, 2025, three weeks before this email, the Ventura court granted his own request for judicial notice of the criminal case (paragraph 100); and the testimony in that record is not ambiguous: Natalie Wald swore that she questioned her daughter about the abuse roughly twice a month, every other week, for approximately two years, on the order of forty-eight times, that some of the times the child said "no" she believed the true answer was yes, and that she confronted Plaintiff about it at least seven times, and James Wald swore that he understood the first report to mean the oral copulation of his four-year-old and told no one. Parents who question a child forty-eight times and confront the accused seven times did not "initially believe" his denials. A lawyer who has read that testimony and writes the opposite to a criminal investigator is not mistaken; he is supplying the "deceived parents" predicate that the charge needed and that his clients' own sworn words had destroyed. Private opposing counsel was curating the evidence file, coaching the charging officer, and feeding a criminal investigator a narrative contradicted by his own clients' testimony, in a proceeding where Plaintiff was told to "refer to the attorney letter."

85. Ball's own words fix his purpose. On August 6, 2025, the day after his report had put Plaintiff in the RHU, Plaintiff emailed Ball notice of this action: "Due to your attempts to weaponize the department of corrections against me, by making knowingly false allegations, you have used threats, intimidation, and coercion to chill the

AF 14900640 1 49 664

exercise of my constitutionally protected right to free speech." On August 8, 2025, at 2:24 p.m., Ball replied from his office email, under the subject line "Re: New Legal Actions Against Mr. Ball": "Travis: Go for it. This weekend I'll be BBQing with my family, going sailing on the ocean, hiking in the hills with my dog and swimming in waterfalls along the trail. . I won't be thinking about you at all except maybe to chuckle occasionally to myself. We all know where you'll be...for the rest of your life. Allen" (Ex. P.) That email was written to a man in solitary confinement, by the lawyer whose report had put him there three days earlier, about the confinement. It advances no claim, no defense, no negotiation, and no scheduling; it serves no object of any litigation and is not a step in any proceeding. It is an admission: the report to RJD was made to inflict custodial harm on an opposing litigant, and Ball took pleasure in the result. Ball repeated the taunt in a different key on April 16, 2026, after the March 20, 2026 order that barred "[n]o other communication" between him and Plaintiff, when he sent Plaintiff, through the Alignable business-networking platform, a solicitation reading: "Hi Martin, It's Allen from Ball & Yorke Law Office in Ventura. I'd like to be able to refer customers to you, so I've added you to my network on Alignable, a site exclusively for business owners to network with each other." (Ex. R.) The recipient was a prisoner whom Ball had told CDCR eight months earlier was a danger to victims and whose business Ball's clients had taken. Neither message has any litigation purpose; each is an act of harassment directed at a captive adversary by the person who controls, through his reports to CDCR, the conditions of that adversary's confinement.

86. On January 13, 2026, "[i]n compliance with the court's order" of December 30, 2025, Ball wrote to the Warden. (Ex. O.) He recited that his office had "notified you by letter dated July 23, 2025 of the harassment of our clients by inmate Travis Edward Martin via electronic means," that "[a]fter investigating the matter, you found our assertions to be true and, in disciplining Inmate Martin, you also imposed an order prohibiting Mr. Martin from contacting either this office or any of our clients (including their families)," and that "Inmate Martin now complains that he cannot prosecute a

AF 14900640 1 50-664

lawsuit that he has filed against our clients . . . without violating the no-contact order." He asked that the order be modified only "for the limited purpose" of "serving papers supporting or opposing motions, and propounding or responding to discovery," and added: "Please be advised that this modification request is not intended to affect in any way, shape or form the orders prohibiting Martin from contacting any of our clients, directly or indirectly. Nor should this modification allow Inmate Martin to try to litigate his claims in the press, such as by making YouTube videos." He then told the Warden that "[s]elf-represented litigants, such as Inmate Martin, are held to the same standards that govern attorneys," and that "[t]hese standards include a prohibition on contacting opponents who are represented by counsel. (Rules Prof. Conduct, rule 2-100, subd. (a).)" (Ex. O.) That statement was false, and Ball knew it. Rule 2-100 was superseded on November 1, 2018 by rule 4.2 of the Rules of Professional Conduct, which applies to a lawyer "[i]n representing a client," and whose official comment states that the rule "does not prevent represented persons from communicating directly with one another with respect to the subject of the representation" and "does not prohibit a lawyer who is a party to a legal matter from communicating on his or her own behalf with a represented person in that matter." (Rules Prof. Conduct, rule 4.2 & com. [3].) A member of the State Bar told a prison warden that a repealed rule forbids what the current rule expressly permits, so that the Warden would keep in place a bar on the one channel every self-represented litigant needs. The letter is an admission that the gag was Ball's, that CDCR had adopted his "assertions," and that Ball was now dictating its scope to the Warden, including a bar on public speech that no prison rule and no court order authorizes.

87. On February 17, 2026, in open court in the 2024 Ventura action, Ball told the court: "If he wants an order, he has to go to the CDCR, we are not the CDCR. We did not implement this sanction. We did not enforce the sanction"; that "several other orders," "including the sentencing restriction," "restricted him from contacting the defendants"; that "the District Attorney has gone after this a couple of times"; and that "[j]ail time doesn't sanction anyone who's in jail for 611 years for child molestation."

AF 14900640 1 51-664

(Ex. P.) Each factual statement was false. Ball requested the discipline, supplied the evidence, shaped the order, and invoked it. There are no "several other orders": the only order restricting Plaintiff's contact with the Walds is the criminal protective order entered at his 2022 sentencing, and it has never been violated, because Plaintiff has never had direct contact with any Wald since it issued; no court, no prosecutor, and no agency has ever found or charged otherwise. And no District Attorney has ever "gone after" anything: no criminal complaint, no contempt proceeding, no protective-order violation, no referral, and no proceeding of any kind concerning Plaintiff's speech has ever been initiated by any prosecutor. Ball produced none when Plaintiff called on him to do so in the reply brief, and none exists. What does exist is what Section IV.B alleges: a Deputy District Attorney, Orellana, who acted entirely outside any judicial or administrative proceeding, in emails and meetings with Yates and the Walds, to suppress the dissemination of the public trial record. Ball's statement that the District Attorney "has gone after this" was an invention offered to a court to make the gag look like law enforcement rather than what it was. The court did not ask him to substantiate it. In his January 29, 2026 opposition Ball argued that "[p]reventing the harassment of the victims and restricting Martin's ability to blame others for his own wrongdoing each further this compelling interest," and in his March 5, 2026 declaration that Plaintiff's claim of denied court access "appears to be false."

88. On May 9, 2026, Plaintiff sent Ball and the Ball Firm a cease-and-desist letter identifying his designated Ventura service address, stating that RJD "is not the designated address for service of process or service of documents in any federal or state case involving Mr. Martin," and demanding that prison-directed transmissions cease; on May 11, 2026 he electronically filed Judicial Council form MC-040 in the 2024 action designating the Ventura address. (Ex. R.) On May 18, 2026, Ball answered in writing: "We have served, and will continue to serve, you at both the Richard J. Donovan Correctional Facility, your actual physical location, and at the UPS mailbox address you have designated in Ventura, California. Service at the prison facility ensures that the

AF 14900640 1 52-664

CDCR maintains a written record of all correspondence and litigation activity in which you are engaged. As you should be aware, your ongoing harassment of your victims' family is already the subject of a formal disciplinary proceeding and remains a significant matter that will bear on any future parole consideration." He closed by stating that his office would "further document and preserve each instance of obstructed service and ongoing harassment" and would "seek appropriate relief from the CDCR as warranted," and asserted that Plaintiff had "never filed a Notice of Change of Address in any of the pending Ventura County cases," a statement false when made. (Ex. R.) The admission is twofold: Ball repeated, in 2026 and with the complete disciplinary record in hand, the victim-family harassment accusation his own 2025 enclosures disproved; and he confirmed that the purpose of routing litigation papers through the prison is to build a CDCR record and inflict parole consequences on an opposing litigant. Plaintiff placed that letter before the Ventura court by declaration filed May 27, 2026, filed a State Bar complaint against Ball supported by it, and on May 26, 2026 gave RJD's mailroom written notice that the Ball Firm's prison-directed mail is part of a willful course of harassment.

89. The prison-directed mailings defy two court orders. The March 20, 2026 order required electronic service and authorized "[n]o other communication." The June 15, 2026 order provided: "The court orders that service to Plaintiff Travis Edward Martin be made at 1746-F South Victoria Ave, Suite #104, Ventura, CA 93003, instead of the prison; this order is only as to this case." (Ex. P.) On August 21, 2026, the Ball Firm filed its motion to declare Plaintiff a vexatious litigant in that same case, and its proof of service recites service by mail on "Travis Martin (CDCR# BU6031) Richard J. Donovan Correctional Facility 480 Alta Road." (Ex. T.) Two months after a judge ordered service at the Ventura address "instead of the prison," Ball mailed to the prison the motion accusing Plaintiff of abusing the courts, and certified to the court that he had done so. That is contempt of the June 15, 2026 order, committed by an officer of the court, in writing, in the court's own file. Ball's ulterior purpose for that act is the one he

AF 14900640 1 53-664

wrote down on May 18, 2026, and every prison mailing since that letter has been a deliberate, announced act: he said he would continue, and he did.

**P. The gag has frozen both Ventura actions, both law firms have said so in writing, a judge directed them to seek relief, and CDCR has answered no one for nine months.**

90. On December 16, 2025, in the 2023 Ventura action, Judge Caudill's minute order stated that "there are work-arounds for the no-contact order, such as communicating through intermediaries, and loosening meet and confer requirements," that "the no-contact order resulted from Martin's actions and was instituted by the California Department of Corrections and Rehabilitation ('CDCR'), not attorney Bamieh or his firm," and that "plaintiff's counsel indicates she will be submitting a request to the CDCR to modify their order to restore direct communication via email and mail between Mr. Martin and her office limited only to the matters of this litigation." (Ex. P.) On December 26, 2025, the Bamieh Firm, by Charlotte E. Krem, wrote to Warden Acevedo and Litigation Coordinator Elizabeth Taboada: "as presently written, the 'no contact' order prevents inmate Martin, who is currently self-represented in this litigation, from engaging in any necessary attorney-party communications with our office concerning the lawsuit. This has created difficulties with advancing the case and complying with litigation obligations," and requested modification to permit meet-and-confer, discovery, settlement, and service communications. (Ex. N.) On December 30, 2025, Judge Coats in the 2024 action directed the Ball Firm to make the same request, and on January 13, 2026 Ball did, conceding that Plaintiff "cannot prosecute a lawsuit that he has filed against our clients" without violating the order. (Ex. O.)

91. CDCR answered no one. It did not respond to the Bamieh Firm, to the Ball Firm, or to the court directive that generated those letters. On March 20, 2026, Judge Coats ordered electronic service as a workaround, "presume[d] that no response was received from CDCR to Ball & Yorke's inquiry re: modification of the CDCR order because exceptions similar to the above relief are implicit in their order," and directed

AF 14900640 1 54-654

his clerk to "serve notice of this ruling on the parties and the CDCR in care of Warden Rafael Acevedo at RJ Donovan Correctional Facility, 480 Alta Road, San Diego, CA 92179, reference inmate Martin, Travis E. CDC #: BU6031." (Ex. P.) CDCR did not respond to that either. As of the filing of this pleading, nine months after the first court-directed request and six months after a judge served the Warden by name, CDCR has issued no response, no modification, no denial, and no explanation. The gag remains in force exactly as Lieutenant Jones wrote it: no contact with either firm or their clients by any means or through any third party, on pain of being "held accountable," with communication permitted only "through the court personnel."

92. The consequences are concrete and continuing. Plaintiff cannot meet and confer, cannot propound or respond to discovery, cannot serve papers except through the court, cannot notice or take depositions, cannot arrange remote appearances that require copying counsel, cannot communicate a settlement offer, and cannot comply with an order that requires him to copy opposing counsel on every email to a courtroom. His nonappearances, each caused by the institution (January 22, 2026: CourtCall coordinator absent and Plaintiff locked in his cell; May 21, 2026: no telephone access; June 5, 2026: CourtCall line disconnected by the institution; September 9, 2026: the prison told the court's staff the hearing "CANNOT be accommodated"), are now cited by the Private Defendants as evidence of his vexatiousness. The gag is the instrument by which the Private Defendants have converted both Ventura actions into cases Plaintiff cannot litigate, and CDCR's silence is the means by which it is enforced.

**Q. No statute, regulation, or legitimate penological interest authorizes a prison sergeant to bar a litigant from communicating with opposing counsel.**

93. No penological interest supports the directives. A blanket, indefinite prohibition on all communication with opposing counsel in pending litigation, by any means, through any third party, on pain of discipline, serves no security interest; it was imposed at an adversary's request for the adversary's benefit; both adversaries have asked in writing that it be lifted; and the obvious alternative, litigation correspondence

AF 14900640 1 55-664

subject to ordinary mail inspection, costs the institution nothing. No provision of title 15 and no statute authorizes a sergeant or a hearing officer to dictate to a self-represented litigant with whom he may communicate in the course of civil litigation; only a court, on motion and with due process, may restrict litigation communications. A California prisoner may be deprived of "such rights, and only such rights, as is reasonably related to legitimate penological interests" (Pen. Code, § 2600, subd. (a)), and subject only to that limit he retains the civil rights "[t]o correspond, confidentially, with any member of the State Bar" and "[t]o initiate civil actions" (Pen. Code, § 2601, subds. (b), (d)). Ball and Bamieh are members of the State Bar. A directive that forbids a prisoner to correspond with them by any means and through any third party, on pain of discipline, strips him of a right the Penal Code expressly preserves, and it was imposed by a sergeant and a lieutenant who identified no penological interest at all. Marsy's Law does not fill the gap: its protections run against the defendant in criminal proceedings and do not deputize prison staff to referee civil cases. (Cal. Const., art. I, § 28, subds. (b), (c).) CDCR arrogated a judicial function to itself and enforces it with the threat of prosecution and further discipline.

**R. In 2026 VCSO told Plaintiff the investigation was "concluded," Yates then swore twice that it is open, and the County's lawyers captioned a Sheriff's letter as the District Attorney's response.**

94. On January 23, 2026, Plaintiff served a deposition subpoena for business records on VCSO in the Ventura Missionary action, seeking VCSO's communications with the Walds, their counsel, the church, and others concerning the dissemination of the trial transcripts. VCSO's counsel, Keshia Kimble, objected by letter dated February 24, 2026: "The Sheriff's Office objects to the subpoena . . . which seeks all records regarding the investigation into the crime and communications with the District Attorney's office. Although the investigation is concluded, the requested materials remain privileged and confidential," and "[t]he Sheriff's Office will not produce the requested investigative materials or DA communications absent a court order." (Ex. S.) The subpoena's

AF 14900640 1 56 664

attachment never mentioned the District Attorney. On March 23, 2026, Kimble wrote again, this time under the caption "Re: Non-Party Ventura County District Attorney's Office Response to Meet and Confer Letter": a Sheriff's Office letter captioned as the District Attorney's response, asserting that the subpoena sought "to probe the contents of a criminal prosecution file through civil discovery" and that the privileges "exist precisely to prevent this type of intrusion into prosecutorial decision making and law enforcement communications." (Ex. S.) The County's own correspondence thus treats the Sheriff's file and the District Attorney's file as one file, defended by one lawyer, for both offices.

95. Eight weeks after telling Plaintiff the investigation was concluded, the County reversed itself under oath. County Counsel's April 20, 2026 opposition to Plaintiff's motion to compel described VCSO as "the agency that investigated his past crimes and has continued an investigation into his post-conviction conduct" and asserted that "VCSO maintains an open investigation into Plaintiff's post-conviction conduct, including investigation into his communications with members and associates of the Ventura Missionary Church." Yates declared under penalty of perjury on April 20, 2026 that "[f]ollowing the conclusion of the above criminal case against Plaintiff, VCSO opened a separate investigation concerning Plaintiff related to a potential violation of a criminal protective order and conspiracy to commit a crime"; that it "stemmed from the online harassment of the Ventura Missionary church, the victim, and her family"; that "VCSO has not closed that investigation and the matter remains open within VCSO's records systems"; that "even where investigative activity is not actively ongoing, law enforcement agencies maintain such matters as open"; and that disclosure "would be especially as concerning to me as a major crimes investigator if such records were to be released to the subject of my investigation." On April 29, 2026 she executed a second declaration to the same effect for the private church defendants' use in their anti-SLAPP motion against Plaintiff. (Ex. S.) Plaintiff's motion to compel was denied on the strength of those declarations.

AF 14900640 1 57-654

96. Those sworn statements convict the scheme. If the investigation has been open since 2023, then every disclosure along the way was a disclosure from an active criminal file to private civil litigants for use against its subject: the tablet findings in Bamieh's May 26, 2023 letter; the prison-side information in the Bamieh Firm's June 30, 2023 letter to Williams; the investigation narrative in the Wald complaint filed August 2, 2023; the August 2, 2023 email chain itself; and its delivery to the Ball Firm on the eve of the RVR. And the two positions cannot both be true: either the February 24, 2026 statement that "the investigation is concluded" was false, or the April 2026 declarations that it "remains open" were false. Each was deployed against Plaintiff, and each served the same end: concealing what Yates and Orellana communicated to the Walds, their attorneys, the church, and the prisons. A three-year "investigation" that identifies no crime, no protected-person contact, and no charge, kept "open" to shield its own records from its subject, is not an investigation. It is a file cabinet with a lock on it.

97. On May 8, 2026, Plaintiff filed a formal citizen complaint against Yates with VCSO Internal Affairs under Penal Code section 832.5, delivered by email, by Federal Express, and through the California POST portal, with copies to POST, the Attorney General, the Department of Justice Civil Rights Enforcement Section, and federal oversight offices, detailing the conduct alleged here and demanding preservation of all related records. On May 15, 2026, VCSO Internal Affairs confirmed in writing that it had received the complaint "in 3 separate mediums," that it was being reviewed, and that the review could take up to a year. (Ex. X.) As of the filing of this pleading, VCSO has announced no findings and taken no corrective action, while Yates's declarations remain of record and are still relied upon against Plaintiff. Since May 2026 at the latest, VCSO and the County have had particularized written notice of Yates's conduct and a standing preservation demand.

AF 14900640 1 58-664

**S. The state courts adopted Defendants' narrative without examining the record before them, and their rulings are the injury Defendants designed.**

98. Plaintiff pleads the following rulings as facts. The rulings are pleaded because they are the mechanism by which Defendants' false reports became "findings," because they measure the injury Defendants have already inflicted on Plaintiff's access to the courts, and because they establish that the state forum has provided, and will provide, no remedy for the obstruction that Defendants Macomber and Acevedo continue to enforce.

99. The method is the same in every filing. Before any question of fact is reached, the Private Defendants introduce Plaintiff to the tribunal by his conviction and then attach the accusation the conviction is meant to make believable. Ball's July 25, 2025 opposition to the first motion to disqualify him opens: "This is an action by a child molester, sentenced to 610 years to life for his crimes, filed against the parents of the child he molested." (Opp., July 25, 2025, 2:2-5.) His August 1, 2025 opposition uses "child molester" fourteen times, "felon" eight times, and "pervert" four times, with a footnote defending the last word. (Opp., Aug. 1, 2025, 3 & fn. 2.) His November 4, 2025 opposition told the court that CDCR "concluded that Bamieh and Ball accurately described plaintiffs conduct as harassment" while conceding, in the same brief, that the matters "involve messages to counsel and internet posts, not communications addressed directly to the Walds" and that "there are no express or explicit threats of violence." (Opp., Nov. 4, 2025, 3:26, 5:21-25.) His March 6, 2026 declaration, sworn under penalty of perjury, begins: "This action was filed by a convicted child molester, naming as defendants the parents of his victim," and swears that Plaintiff's inability to serve discovery "appears to be false." (Ball Decl., Mar. 6, 2026, ¶ 2.) His May 29, 2026 opposition offers the conviction as evidence of motive: "Plaintiff's criminal history is also relevant to show an improper purpose of harassing defendants." (Opp., May 29, 2026, 3:1-3.) In the 2023 action, De Smeth told the court on August 20, 2026 that "he's serving 610 years in prison for a reason," and the firm's September 10, 2026 reply brief

AF 14900640 1 59-664

states that "[h]is abuse of the civil judicial process is a prolonged and twisted means of continuing to harm his victim and her family." (Ex. T.) Across the two actions, the record shows the only communications that exist: two emails to Ball's own office about reviews of Ball's firm, a CDCR evidence list with no email to any victim or family member, and a hearing officer's written concession that proof of contact with the family "was not submitted into evidence." No court in either action has ever asked Ball or Bamieh to produce the harassment of victims that every filing describes.

100. August 14, 2025 (2024 action). Plaintiff's motions for a preliminary injunction, for judgment on the pleadings, and to disqualify Ball were set for August 14, 2025. On August 5, Ball's report to RJD put Plaintiff in the RHU. On August 13, Plaintiff filed a declaration under penalty of perjury that "Mr. Ball contacted the RJ Donovan Correctional Facility were I am housed. He falsely alleged to peace officers at the prison that I was making criminal threats toward him and his firm," that "[b]ased on Mr. Ball's reports, I was placed in solitary confinement," that the prison had scheduled a mandatory administrative meeting at the hour of the hearing, and that he asked for one week. (Ex. P.) The court convened the next morning, recorded that "[t]here are no appearance(s) by the plaintiff," denied the continuance without stated reason, declined oral argument, granted Ball's request for judicial notice of "the civil and criminal cases involving Plaintiffs," denied Plaintiff's request to strike "felon," "child molester," and "pervert" from the opposition, and denied all three motions. (Ex. P.) On October 28, 2025, the court adopted a tentative stating: "The Court previously concluded that references to Plaintiff's criminal conduct are not improper." (Ex. P.)

101. December 2, 2025 through January 22, 2026 (2023 action). The court's minute orders on Plaintiff's motions open, three times, with the same sentence: "This is an action by an underage victim of childhood sexual abuse ('PW') and her parents ... against her perpetrator, Defendant/Cross-Complainant Travis Edward Martin ... pro per, his mother, and his company. The Walds allege that Martin continues to harass and defame them from behind bars." (Ex. P.) On December 16, 2025, the court denied

AF 14900640 1.60-664

Plaintiff's motion to disqualify the Bamieh Firm over the no-contact order and wrote: "As the opposition correctly states, there are work-arounds for the no-contact order, such as communicating through intermediaries ... The Court also notes that the no-contact order resulted from Martin's actions and was instituted by the California Department of Corrections and Rehabilitation ('CDCR'), not attorney Bamieh or his firm." (Ex. P.) The order the court described forbids contact "by any third party"; the "work-around" it prescribed is a rules violation. The record before the court contained the RVR, whose origin line reads "received a notification from the Litigation Office at RJDCF," whose Attachment #1 is the Bamieh Firm's own letter demanding "discipline if not prosecution," and whose reporting employee had testified that his determination was made on receipt of the Ball Firm's letter. The finding that the order "resulted from Martin's actions" cites no evidence; it is the opposition's sentence, adopted. The same order awarded the Walds $34,237.91 in fees. Ten days later the Bamieh Firm's own letter to the Warden confirmed what the court had just denied mattered: "as presently written, the 'no contact' order prevents inmate Martin, who is currently self-represented in this litigation, from engaging in any necessary attorney-party communications with our office," and the court "specifically directed our office to contact CDCR and formally request a modification." (Ex. N.) On January 22, 2026, the court recorded "no appearance(s) by the Defendant, Travis Martin" and denied reconsideration; the prison had not provided telephone access. When Plaintiff moved to correct that record, the court ruled on June 5, 2026 that his absence because "he was prevented by the California Department of Corrections from accessing the telephone for the hearing" was "not a new or different fact or circumstance or law or reason for the nonappearance." (RT 6/5/26, 8:16-22.)

102. December 30, 2025 through February 17, 2026 (2024 action). On December 30, 2025, the court denied "with prejudice" Plaintiff's second motion to disqualify Ball, the motion built on Ball's July 23 letter, his September 5 email to the investigator, and the RVR, without discussing any of them, and in the same order directed "the Office of